# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 10, 2012　　　Decided November 2, 2012

No. 12-5027

IN RE: NAVY CHAPLAINCY,

CHAPLAINCY OF FULL GOSPEL CHURCHES, ET AL.,
APPELLANTS

v.

UNITED STATES NAVY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-mc-00269)

———

*Arthur A. Schulcz, Sr.* argued the cause and filed the briefs for appellant.

*Lewis Yelin*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Ronald C. Machen Jr.,* U.S. Attorney, and *Marleigh D. Dover*, Attorney.

Before: HENDERSON, ROGERS, and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: In this case, military chaplains, all "non-liturgical Protestants," allege that the Navy systematically discriminates against members of their religious denominations in the awarding of promotions in violation of "[t]he clearest command of the Establishment Clause . . . that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). The district court denied plaintiffs' motion for a preliminary injunction, concluding that they lacked Article III standing and, alternatively, were unlikely to succeed on the merits of their claims. For the reasons set forth in this opinion, we reverse the district court's determination that plaintiffs lack Article III standing and remand for further factual findings regarding their likelihood of success on the merits.

## I.

The Navy maintains a Chaplain Corps of commissioned Naval officers who have the "responsibility . . . to provide for the free exercise of religion" for all members of the Navy and their families. *In re England*, 375 F.3d 1169, 1171 (D.C. Cir. 2004) (internal quotation marks omitted). Chaplains perform a "unique" role, serving both "as clergy or . . . professional representative[s] of a particular religious denomination and as . . . commissioned naval officer[s]." *Id.* (internal quotation marks omitted). The Navy divides the Chaplain Corps into four "faith groups": Catholic, liturgical Protestant, non-liturgical Protestant, and Special Worship. *Id.* at 1172.

Plaintiffs, current and former military chaplains, are "non-liturgical Protestants." Non-liturgical Protestants belong to Protestant denominations—including Baptist, Evangelical, Pentecostal, and Charismatic—that follow no formal liturgy

in worship services and baptize at the "age of reason" rather than at infancy. *In re Navy Chaplaincy*, 534 F.3d 756, 759 (D.C. Cir. 2008). In order to become a Navy chaplain, an individual must have an "ecclesiastical endorsement" from a faith group endorsing agency certifying that the individual is professionally qualified to represent that faith group within the Chaplain Corps. *In re England*, 375 F.3d at 1171–72. Two such endorsing agencies, Chaplaincy of Full Gospel Churches and Associated Gospel Churches, are among the plaintiffs in this case.

Like all Navy officers, chaplains are recommended for promotion by "selection boards" convened to consider whether particular candidates should be promoted to a higher rank. *Id.* at 1172. Because selection boards are required by statute to include at least one member from the "competitive category" being considered for promotion, selection boards considering chaplain promotions must have at least one chaplain as a member. 10 U.S.C. § 612(a)(2)(A). By instruction of the Secretary of the Navy, chaplain selection boards are currently composed of seven members: two chaplains and five other officers. SECNAVINST 1401.3A, Suppl. ¶ 1.c.(1)(f). Selection boards make initial promotion recommendations that are subsequently reviewed by the Secretary of the Navy and then submitted to the Secretary of Defense for transmittal to the President. 10 U.S.C. §§ 618(a)(1), (c)(1).

Plaintiffs contend that Naval selection boards discriminate against non-liturgical Protestant chaplains on the basis of religious denomination. Relying on statistical analysis by their expert and other evidence, they assert that non-liturgical Protestant chaplains are promoted to higher ranks at significantly lower rates than are liturgical Protestant and Catholic chaplains, and that candidates are more likely to be

recommended for promotion when they share the denomination of the chaplains who sit on the selection board.

Plaintiffs focus on certain "policies, practices, and procedures" that they allege "facilitate and allow denominational or faith group favoritism." Appellants' Br. 7 (emphasis omitted). Specifically, plaintiffs allege that the small size of the selection boards and the practice of voting in secret allow promotion decisions to be made on the basis of religious bias. Selection board members vote by pressing one of five buttons that indicate the degree of confidence the voter has in the candidate, ranging from zero to 100. Plaintiffs contend that because boards are composed of only seven members, a chaplain can essentially veto a candidate by voting a "zero" level of confidence, thus significantly reducing that candidate's chances of selection. According to plaintiffs, because chaplains can exercise this veto power in secret, they are free to select candidates based on their own religious conceptions of how ministry should be conducted. Plaintiffs also challenge the practice of appointing the Chief of Chaplains as president of chaplain selection boards, asserting that the Chief's "role and influence as a decision maker in the award of Navy benefits introduces religion into the decision and results in denominational favoritism." Pls.' Mem. in Supp. of Mot. for Prelim. Inj. 23. Plaintiffs tell us that "the other Armed Services" avoid these problems by convening larger selection boards and requiring public voting. Appellants' Br. 60.

As we understand it, plaintiffs' claim rests on two distinct theories. First, in what we shall call their "denominational preference" theory, they assert that selection boards discriminate against non-liturgical Protestants in making promotion decisions in violation of the Establishment Clause and the Fifth Amendment's equal protection component.

Second, plaintiffs assert that the Navy, also in violation of the Establishment Clause, impermissibly delegates governmental authority to religious entities by permitting chaplains to award government benefits in the form of promotions without effective guarantees that such authority will be exercised in a neutral, secular manner.

The Navy takes issue with both theories. With respect to the denominational preference theory, the Navy asserts that there is no "factual basis for [plaintiffs'] claims that Navy chaplain promotion boards had discriminated against plaintiffs in the past or would likely do so in the future." Appellees' Br. 36. Relying on its own statistical expert, the Navy challenges the methodology employed by plaintiffs' expert and asserts that its "own evidence establish[es] the absence of any religious discrimination by the promotion boards." Appellees' Br. 35. As to plaintiffs' second theory, the Navy asserts that the authority delegated to chaplains who sit on promotion boards is not at all standardless because the chaplains "must abide by statutory requirements and Navy instructions governing the selection of officers for promotion." Appellees' Br. 43.

Plaintiffs filed a motion for a preliminary injunction seeking to enjoin the challenged procedures. Denying the motion, the district court began by concluding that plaintiffs lacked Article III standing, reasoning that their asserted future injury was too speculative because it rested on the assumption that chaplains sitting on future selection boards would " 'necessarily favor candidates affiliated with [their] own denomination,' " an assumption the court found implausible given that Naval officers "are presumed to undertake their official duties in good faith." *In re Navy Chaplaincy*, 841 F. Supp. 2d 336, 345 (D.D.C. 2012) (citation omitted). The district court went on to conclude that even if plaintiffs had

Article III standing, the balance of the four preliminary injunction factors weighed against granting injunctive relief. Although the court presumed the existence of irreparable harm because plaintiffs had alleged an Establishment Clause violation, *id*. at 347, the court found that plaintiffs were unlikely to succeed on the merits, *id*. at 345–46, and that the balance of equities and the public interest weighed against granting preliminary injunctive relief. *Id.* at 347–49. Plaintiffs now appeal.

## II.

We begin with the question of whether we have statutory jurisdiction to hear this case. In the district court, the Navy argued that the court lacked jurisdiction to consider plaintiffs' claims because courts are prohibited by statute from reviewing claims based "on the failure of a person to be selected for promotion by a promotion board" unless the person has first exhausted administrative remedies. 10 U.S.C. § 628(h)(1). The district court rejected this argument, *In re Navy Chaplaincy*, 841 F. Supp. 2d at 344, and the Navy has wisely chosen not to renew it on appeal. As the district court explained, jurisdiction is proper because plaintiffs ask us "to determine the validity of [a] law, regulation, or policy relating to selection boards," not to review the promotion decisions of individual selection boards. *Id*.; *see* 10 U.S.C. § 628(i)(1) ("Nothing in this section limits[] the jurisdiction of any court of the United States . . . to determine the validity of any law, regulation, or policy relating to selection boards."). We thus turn to the question of Article III standing, an issue we review de novo. *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011).

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or

controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). To establish constitutional standing, a plaintiff must show (1) an injury in fact that is "concrete and particularized" and "actual or imminent"; (2) that the injury is "fairly traceable" to the defendants' challenged conduct; and (3) that the injury is likely to be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and alterations omitted). And, as we earlier explained in this very litigation, "[i]n reviewing the standing question, we must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *In re Navy Chaplaincy*, 534 F.3d at 760.

Where as here plaintiffs seek "forward-looking injunctive . . . relief, past injuries alone are insufficient to establish standing." *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (internal quotation marks omitted). Instead, plaintiffs must show that they face an imminent threat of future injury. *Lyons*, 461 U.S. at 105; *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). Here, plaintiffs contend that they face future injury because they will likely suffer discrimination on the basis of their religious denomination when they are considered for promotion by future selection boards. This assertion of future injury depends on two subsidiary premises: that plaintiffs will be considered for promotion by future selection boards and that selection boards will discriminate against them on the basis of their religious denomination.

The first premise is undisputed. The Navy concedes that future selection boards may very well consider the promotion of at least some plaintiffs. Appellees' Br. 19. Thus, this is not a situation in which plaintiffs have asserted mere " 'some day'

intentions" to engage in the conduct they claim will cause them injury. *Lujan*, 504 U.S. at 564; *see also Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1273–74 (D.C. Cir. 1994) (plaintiffs lacked standing to seek injunctive relief where they failed to allege that they would seek job referrals in the near future from the defendant they claimed would discriminate against them on the basis of race). Here, at least some plaintiffs will probably appear before selection boards in the near future.

The second premise—that selection boards are likely to discriminate against plaintiffs on the basis of their religious denomination—is disputed by the Navy on the grounds that the asserted future injury depends, as the district court found, on the questionable assumption that "chaplains who will serve as promotion board members will necessarily favor candidates affiliated with [their] own denomination." *In re Navy Chaplaincy*, 841 F. Supp. 2d at 345 (internal quotation marks omitted). According to the Navy, mere predictions that chaplains will someday behave in a biased manner are too conjectural to support standing. It is true that vague predictions of future discriminatory conduct are insufficient to demonstrate the imminent threat of future injury necessary to support standing to seek injunctive relief. In *Lyons*, for example, the Supreme Court held that a plaintiff who had previously been stopped by the police and subjected to a chokehold lacked standing to seek injunctive relief because the plaintiff's assertion that the police were likely to apply a chokehold to him again in any future encounter was too speculative to demonstrate an imminent threat of future injury. 461 U.S. at 105–06. We have similarly found standing lacking where plaintiffs claimed future injury based on speculation about alleged discriminatory practices unconnected to concrete policies. *See Worth v. Jackson*, 451

F.3d 854, 860 (D.C. Cir. 2006) (plaintiff failed to demonstrate likely future injury where he "challenge[d] no statute, regulation, or written policy committing HUD to favoring minorities or women, resting his claim instead on speculation, untethered to any written directive, about how HUD is likely to make future employment decisions").

In this case, however, plaintiffs' asserted future injury does not depend solely on speculation about whether individual chaplains will behave in a biased manner. Instead, plaintiffs challenge specific policies and procedures—the casting of secret votes, the small size of selection boards, and the appointment of the Chief of Chaplains as president—that they claim have resulted in denominational discrimination and, if not ended, will continue to do so in the future. Unlike in other cases, like *Lyons*, where plaintiffs speculated about the very existence of the unwritten discriminatory practices at issue, here the Navy acknowledges that the challenged policies and procedures not only exist, but will continue to govern the conduct of future selection boards. The prospect of future injury becomes significantly less speculative where, as here, plaintiffs have identified concrete and consistently-implemented policies claimed to produce such injury. For example, the Supreme Court suggested in *Lyons* that the plaintiff would have been able to show a likelihood of future injury had he alleged that the City maintained a policy directing or authorizing the use of chokeholds without provocation. 461 U.S. at 105–06. Similarly, in *NB ex rel. Peacock*, where Medicaid-eligible plaintiffs claimed they faced an imminent threat of future prescription coverage denials without the required notice, we found it significant that plaintiffs had alleged that the defendant maintained "a policy of denying prescription coverage without providing the various forms of notice that plaintiffs claim are required." 682 F.3d at 85. We emphasized that plaintiffs had alleged "not

only that numerous specific denials of coverage were made without adequate notice, but also that [the defendant's] guidance and manuals . . . contain no provisions for giving Medicaid recipients written notice of the reasons for coverage denials." *Id*. (citations omitted).

To be sure, plaintiffs here never allege that the challenged policies directly authorize discrimination against or require disparate treatment of non-liturgical Protestants. Instead, they assert that these policies facilitate or exacerbate discrimination by chaplains serving on selection boards. We take the Navy's point that the asserted causal link between the policies and the alleged discrimination is more attenuated here than in a case where the challenged policies directly authorize the allegedly illegal conduct. *Cf. Worth*, 451 F.3d at 859 (plaintiff had standing to challenge HUD's written affirmative action plan authorizing racial and gender goals in employment). That said, we conclude that plaintiffs' allegation that the challenged policies will likely result in discrimination is sufficiently non-speculative to support standing. For one thing, chaplains inclined to vote on the basis of their religious preferences may be more likely to do so under the cover of secret ballots. Moreover, it goes without saying that the small size of selection boards gives potentially biased chaplains more influence over the outcome of the proceedings.

We would have a different view of this issue if plaintiffs' claims of discrimination on the basis of religious denomination were the type of "fantastic" allegations that have given us pause elsewhere. *Tooley v. Napolitano*, 586 F.3d 1006, 1009 (D.C. Cir. 2009) (internal quotation marks omitted). But this is not such a case. Our nation has long grappled with the curse of discrimination on the basis of religious belief. The "spiritual tyranny" of the Anglican

Church was one reason why Thomas Jefferson proposed the Virginia Statute for Religious Freedom of 1786. Merrill D. Peterson, *Thomas Jefferson and the New Nation* 133–34 (1970 ed.). In the late nineteenth century, reflecting the then "pervasive hostility" towards the Catholic Church, the nation nearly adopted the infamous Blaine Amendment, which would have barred aid to "sectarian"—widely understood to mean "Catholic"—institutions. *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion). And in more recent times, courts have invalidated laws that discriminate against particular religious beliefs or practices by laying "the hand of the law . . . on the shoulder of a minister of [an] unpopular group." *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953) (invalidating municipal ordinance interpreted to prohibit preaching in public park by a Jehovah's Witness but to allow church services by Catholics and Protestants); *see also Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542, 546–47 (1993) (invalidating ordinances prohibiting animal sacrifice found to be aimed at suppressing the religious practices of Santeria adherents).

In response to plaintiffs' claims, the Navy attacks the evidentiary underpinnings of plaintiffs' allegations and argues that the challenged procedures do not result in discrimination against non-liturgical Protestants. This argument, however, goes to the merits of plaintiffs' claims, not their standing to bring them. To be sure, the Navy may challenge plaintiffs' evidence to the extent it relates to standing, but it may not "bootstrap standing analysis to issues that are controverted on the merits." *Public Citizen v. FTC*, 869 F.2d 1541, 1549 (D.C. Cir. 1989). Here, the Navy neither disputes plaintiffs' claims that they will expose themselves to potential injury by applying for promotions nor argues that it has any plans to change the procedures alleged to injure plaintiffs. Instead, the Navy argues that plaintiffs' evidence fails to demonstrate a

pattern of discrimination against non-liturgical Protestants. Perhaps the Navy is right about this, but that is a question for the merits, not for standing, and at this stage we must assume that plaintiffs will prevail on the merits. Thus, in *In re Navy Chaplaincy*, we "assume[d] arguendo that the Navy's operation of its retirement system favors Catholic chaplains and disfavors non-liturgical Protestant chaplains in violation of the . . . Establishment Clause." 534 F.3d at 760 (internal quotation marks omitted). Here too we must assume that plaintiffs will prevail on their claims that the Navy's promotion system operates in a similarly discriminatory fashion.

We are thus satisfied that at least those plaintiffs whose promotions will likely be considered by future selection boards operating under the challenged policies have standing to pursue their claims for injunctive relief. Although future injury is not certain, "absolute certainty is not required." *NB ex rel. Peacock*, 682 F.3d at 85. It is sufficient that plaintiffs have demonstrated a "likelihood of injury that rises above the level of unadorned speculation—that is, a realistic danger that [they] will suffer future harm." *Id.* at 85–86 (internal quotation marks omitted). Because only one plaintiff must have standing, we have no need to consider either the Navy's motion to dismiss certain retired and former chaplains from the appeal for lack of standing or whether the organizational plaintiffs have standing to pursue their claims. *Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009).

## III.

We turn next to the district court's denial of plaintiffs' motion for a preliminary injunction. A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S.

7, 22 (2008). In order to obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. We review the district court's ultimate decision to deny injunctive relief, as well as its weighing of the preliminary injunction factors, for abuse of discretion. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). We review the district court's legal conclusions de novo and its findings of fact for clear error. *Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998).

In this case, although the district court presumed the presence of irreparable harm because plaintiffs had alleged an Establishment Clause violation, it ultimately denied their motion for a preliminary injunction, concluding that they were unlikely to succeed on the merits and that both the balance of equities and the public interest weighed against granting the injunction. As the Navy concedes, the district court correctly assumed that plaintiffs have demonstrated irreparable harm. Appellees' Br. 44; *see Chaplaincy of Full Gospel Churches*, 454 F.3d at 303 ("[W]here a movant alleges a violation of the Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong for purposes of the preliminary injunction determination."). Moreover, the Supreme Court has instructed that, in assessing the balance of equities and the public interest, we must " 'give great deference to the professional judgment of military authorities' " regarding the harm that would result to military interests if an injunction were granted. *Winter*, 555 U.S. at 24 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)). This leaves the question of likelihood of success on the merits.

We begin with plaintiffs' delegation theory—that the Navy impermissibly delegates governmental authority to religious entities by permitting chaplains to make promotion decisions without effective guarantees that the authority will be exercised in a secular manner. In support, plaintiffs cite *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116 (1982), in which the Supreme Court held that a Massachusetts statute granting religious institutions an effective veto power over applications for liquor licenses violated the Establishment Clause because the delegated power was "standardless, calling for no reasons, findings, or reasoned conclusions" and because there were no "effective means of guaranteeing that the delegated power will be used exclusively for secular, neutral, and nonideological purposes." *Id.* at 125; *see also United Christian Scientists v. Christian Science Board of Directors*, 829 F.2d 1152, 1170–71 (D.C. Cir. 1987). Plaintiffs emphasize that they object not to the mere delegation of civic authority, but rather to the fact that such delegation is, as in *Larkin*, devoid of standards and procedural guarantees to ensure the neutral exercise of such power.

This case is a far cry from the "standardless" delegation scheme at issue in *Larkin*. Here, Congress and the Secretary of the Navy have articulated secular, neutral standards to guide selection board members in evaluating candidates for promotion. Specifically, board members are required by statute to recommend for promotion those officers they deem "best qualified for promotion within each competitive category considered by the board," 10 U.S.C. § 616(a), and the Navy provides to each selection board specific "guidance relating to the needs of the Navy . . . for officers with particular skills in each competitive category, and other information and guidelines as necessary to enable the board to perform its functions properly." SECNAVINST 1420.1B,

¶ 13.d.(2). And unlike in *Larkin*, where the churches had final say over the liquor license applications, 459 U.S. at 125, here the two chaplains on the selection boards share decision-making authority with five others, and the board's promotion decisions are subject to further review by the Secretary of the Navy and the Secretary of Defense. 10 U.S.C. §§ 618(a)(1), (c)(1). We thus see no error in the district court's conclusion that plaintiffs are unlikely to succeed on the merits of their delegation theory.

We have a different view of the district court's resolution of plaintiffs' denominational preference theory, i.e., that the Navy discriminates against non-liturgical Protestants on the basis of their religious denomination. As discussed above, plaintiffs contend that their statistical analysis provides strong evidence of a pattern of discrimination. For its part, the Navy challenges plaintiffs' evidence and offers its own expert analysis that it claims demonstrates that no such discrimination exists.

Unfortunately, the district court made no factual findings to resolve these competing claims. All it had to say about the issue was this: "the plaintiffs have submitted no evidence from which the court could assume that the future promotion boards will follow any putative pattern of alleged past discrimination." *In re Navy Chaplaincy*, 841 F. Supp. 2d at 346. But this is the wrong legal standard. Whether "future" promotion boards are likely to discriminate on the basis of religious denomination is, as we have explained, the question we ask to determine whether plaintiffs have Article III standing. The issue before us now—whether plaintiffs are likely to succeed on the merits—turns on whether they have made a strong showing of a pattern of *past* discrimination on the basis of religious denomination and whether that pattern is linked to the policies they challenge. Perhaps by saying that

plaintiffs had "submitted no evidence from which the court could assume" future injury, *id*., the district court meant to say that plaintiffs' evidence of a pattern of past discrimination, when considered in light of the Navy's contrary evidence, was unpersuasive. Yet the district court never said so, much less explained why it reached any such conclusion. Under these circumstances, we have no findings to review for clear error. *See Lyles v. United States*, 759 F.2d 941, 944 (D.C. Cir. 1985) ("Where the trial court provides only conclusory findings, unsupported by subsidiary findings or by an explication of the court's reasoning with respect to the relevant facts, a reviewing court simply is unable to determine whether or not those findings are clearly erroneous.").

The Navy insists that the district court did make factual findings regarding plaintiffs' showing of past discrimination. In support, it points to the court's statement that "the evidence put forth by the plaintiffs at best establishes a colorable claim to relief under the Establishment Clause." *In re Navy Chaplaincy*, 841 F. Supp. 2d at 349. At oral argument, counsel for the Navy claimed that this amounts to an implicit factual finding to which we must defer unless clearly erroneous. Oral Arg. Rec. 34:05–34:32, 34:58–35:30; *see Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1159 (D.C. Cir. 2007) (applying clear error review to implicit factual finding of district court in granting preliminary injunction). But the cited statement cannot fairly be read as a finding—implicit or otherwise—about the strength of plaintiffs' showing of past discrimination. The district court's entirely conclusory statement gives us no insight at all into whether the court perceived the defect in the Establishment Clause claim to be legal or factual, or, if factual, whether it thought the weakness lay in the evidence of past or future discrimination.

## IV.

For the foregoing reasons, we reverse the district court's determination that plaintiffs lack Article III standing to seek injunctive relief. We also vacate the district court's denial of a preliminary injunction and remand for further proceedings consistent with this opinion.

*So ordered.*