# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 6, 2013     Decided December 27, 2013

No. 13-5071

IN RE: NAVY CHAPLAINCY,

CHAPLAINCY OF FULL GOSPEL CHURCHES, ET AL.,
APPELLANTS

v.

UNITED STATES NAVY, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-mc-00269)

———

*Arthur A. Schulcz Sr.*, argued the cause and filed the briefs for appellants.

*Sushma Soni*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Stuart F. Delery*, Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Marleigh D. Dover*, Attorney.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Plaintiffs, whom we'll call simply the chaplains, are a group of current and former officers in the Navy Chaplain Corps who identify themselves as non-liturgical Christians, plus two chaplain-endorsing agencies. They sued in district court, claiming (among other things) that several of the Navy's policies for promoting chaplains prefer Catholics and liturgical Protestants at the expense of various non-liturgical denominations. The basic argument is that the policies amount to disparate treatment of the non-liturgical chaplains, violating the equal protection component of the Fifth Amendment and the Establishment Clause of the First Amendment.

The case has already been before this court several times. See *In re Navy Chaplaincy*, 697 F.3d 1171 (D.C. Cir. 2012); *In re Navy Chaplaincy*, 534 F.3d 756 (D.C. Cir. 2008); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006). The judgment now on review is that of the district court denying plaintiffs' motion for a preliminary injunction against the Navy's use of the challenged practices. *In re Navy Chaplaincy*, 928 F. Supp. 2d 26 (D.D.C. 2013). The district court reviewed the statistical evidence offered by the plaintiffs to show inter-denominational discrimination, and found it wanting. We affirm.

\* \* \*

The Navy uses "selection boards" to choose officers for promotion. See 10 U.S.C. § 611(a). By law, such boards must have at least five members. 10 U.S.C. § 612(a)(1). Except in certain circumstances not at issue here, at least one member of a selection board for a competitive category—

here, the Chaplain Corps—must be from that competitive category. 10 U.S.C. § 612(a)(2)(A). Selection boards for chaplains before fiscal year 2003 consisted of five or more members, at least one of whom was not a chaplain. Under a change in Navy regulation, boards for fiscal year 2003 and thereafter are composed of seven officers, two of whom are chaplains "nominated without regard to religious affiliation." SECNAVINST 1401.3A, Encl. (1), ¶ 1.c.(1)(f). Either the Chief of Chaplains or one of his two deputies serves as selection board president. According to a Defense Department Inspector General report cited by plaintiffs, "sleeves" hide the board members' hands as they depress buttons reflecting their votes, making them secret ballots. According to the chaplains, the boards take an initial secret vote and then the board president recommends two score cut-offs: candidates above the higher score are treated as clearly deserving promotion, and ones below the lower score are treated as deserving no further consideration. Candidates who fall between the two are re-evaluated for the remaining available promotions.

The chaplains asked the district court to enjoin three current Navy selection board policies—(1) staffing the seven-member selection boards with two chaplains, (2) enabling members to keep their votes secret via the "sleeves," and (3) allowing the Chief of Chaplains or his deputy to serve as the selection board president—that they claim result in disparate treatment of the non-liturgical candidates. Plaintiffs' (July 22, 2011) Motion for a Preliminary Injunction 1. The disparate treatment, they say, is shown by various statistical data, which we'll consider shortly.

The chaplains' theory is that a candidate is more likely to be promoted if he or she shares a religious denomination with one of the chaplains on the selection board, or with the Chief of Chaplains. The bottom line is an advantage in promotion

rates for Catholics and liturgical Protestants over non-liturgical Christians. The chaplains posit that the small board size, combined with secret votes, enables each board's chaplains to ensure that a particular candidate will not be promoted, thus increasing the odds for their preferred (and discriminatory) results.

Pending resolution of their summary judgment motion, the chaplains asked the district court for a preliminary injunction halting the challenged policies. The district court denied the request, but we vacated the denial and remanded for the district court to clarify its reasoning on the chaplains' likelihood of success on the merits; we were unsure whether the district court viewed the insufficiency of the chaplains' claims to be legal or factual. See *In re Navy Chaplaincy*, 697 F.3d at 1180. On remand, the district court concluded that the chaplains were unlikely to succeed on the merits of either claim because the statistics they offered failed to show any discriminatory intent behind the challenged policies or the resulting outcomes. *In re Navy Chaplaincy*, 928 F. Supp. 2d at 36-37.

The chaplains appeal to us again, claiming that the court erred in requiring a showing of intent to prove either an equal protection or establishment clause violation. We find that the chaplains' equal protection attack on the Navy's facially neutral policy could prevail only if they showed a likelihood of success in proving an intent to discriminate (which they have not shown) or the lack of a rational basis for the policies (which they have not claimed). As to the Establishment Clause, the chaplains have not shown a likelihood of success under any test that they have asked the court to apply. We therefore affirm the district court's denial of the preliminary injunction.

5

\* \* \*

In order to determine whether to issue a preliminary injunction, the district court applies four familiar criteria: (1) likelihood of success on the merits; (2) irreparable injury; (3) lack of substantial injury to other parties; and (4) furthering the public interest. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. We have already found an absence of any error in the district court's analysis of the last three factors, and have made clear that the only unresolved issue is whether the chaplains have shown a likelihood of success on the merits. *In re Navy Chaplaincy*, 697 F.3d at 1179. The chaplains in effect argue that the district court used improper legal standards on that issue. But the record and the district court's findings allow us to resolve the question of likelihood of success on the merits on our own, and we accordingly do so. See *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (legal conclusions upon which denial of preliminary injunction relies are reviewable de novo).

*Equal protection*. The chaplains argue that the three challenged policies result in disparate treatment of non-liturgical chaplains. But none of the challenged practices on its face prefers any religious denomination. The regulation behind the practice of staffing boards with two chaplains explicitly requires denominational neutrality. "Chaplain Corps board members shall be nominated without regard to religious affiliation." SECNAVINST 1401.3A Encl. (1), ¶ 1.c.(1)(f) (Dec. 20, 2005). Thus, even if one of the chaplains always serves as board president (as the chaplains allege), the board president, necessarily a board member, must be a person chosen for the board without regard to religious affiliation. Finally, the practice of secret voting is neutral on its face. All three policies together, then, are facially neutral with respect to denomination.

The chaplains nonetheless claim that the policies either were adopted with discriminatory intent or have been applied in such a manner as to favor denominations other than the non-liturgical ones. As the district court found, the chaplains have presented no evidence of discriminatory intent in the policies' enactment. Nor have they shown a current pattern of disparate outcomes from which unconstitutional discriminatory intent could be inferred under the prevailing understanding of equal protection. For such claims, "Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (1977) (citing *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)). The district court found, at best, only a 10% advantage in promotion rates for officers of the same denomination as the Chief of Chaplains (the difference between a 73.3% promotion rate for candidates of different denominations and an 83.3% rate for candidates of the same denomination). *In re Navy Chaplaincy*, 928 F. Supp. 2d at 37.

There is some internal contradiction in the chaplains' position on these figures. Their brief states that they cover promotions in the period 2003-2012, when the current procedures were in place (Appellants' Br. at 15), but it cites Joint Appendix ("J.A.") 1107, an affidavit that situates the data in 1981-2000, before the proportion of chaplains on the selection boards was decreased. Giving the chaplains the benefit of the doubt, we assume the data apply to the later period, the one governed by the rules they seek to enjoin. The chaplains' only efforts to show a larger disparity rely on data for selections occurring before the 2003 changes.

The district court correctly noted that the disparity between 73.3% and 83.3% does not remotely approach the stark character of the disparities in *Gomillion* or *Yick Wo*. *Id.*

For reinforcement, plaintiffs cite their expert's opinion that this disparity is statistically significant. The record does not explain the reasoning behind the choice of one set of statistical tests for significance over another (e.g., a "simple binomial" test versus a standard test of the differences in proportions), or demonstrate the actual calculations. See, e.g., Appellants' Br. at 15. But assuming arguendo that the methodology for determining statistical significance is reasonable, the finding does little for our analysis. "Correlation is not causation." *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988). Statistical significance, assuming it has been shown, indicates only a low probability for one possible cause of the alleged disparities—random chance. The chaplains have made no attempt to control for potential confounding factors, such as promotion ratings, education, or time in service. (That statement must be qualified by recognition that time in service is broadly reflected in occasional references to whether the candidates were "in zone" (*i.e.*, were within a group of a predetermined number of the most senior officers who had not previously been considered for promotion to a given grade) or "above zone" (*i.e.*, had previously been considered for promotion to a given grade). See, e.g., J.A. 1468-70 (chaplains' tables noting comparisons of in zone candidates, and of in zone and above zone candidates); J.A. 1289-92 (Navy employee affidavit describing the zone compositions).) Thus the label "statistically significant" does nothing to elevate plaintiffs' figures into the realm of *Yick Wo* or *Gomillion*.

Given facially neutral policies and no showing of intent to discriminate, the chaplains' equal protection attack on the Navy's specific policies could succeed only with an argument that the policies lack a rational basis. See *Washington v. Davis*, 426 U.S. 229, 242 (1976); *United States v. Thompson*, 27 F.3d 671, 678 (D.C. Cir. 1994). The chaplains attempt no

such argument. So we agree with the district court that they have not shown the requisite likelihood of success.

*Establishment*. The chaplains say that under *Larson v. Valente*, 456 U.S. 228 (1982), we must subject the challenged selection methods to strict scrutiny on the ground that they "grant[] a denominational preference," *id*. at 246, or, failing that, find that they run afoul of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), notably the element of *Lemon* now generally described as the "endorsement" test.

The chaplains' proposed analytical sequence matches the structure laid down by the Supreme Court for measures assailed as denominational preferences. "*Larson* teaches that, when it is claimed that a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions. If no such facial preference exists, we proceed to apply the customary three-pronged Establishment Clause inquiry derived from *Lemon v. Kurtzman*, 403 U.S. 602 (1971)." *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 695 (1989). As the challenged policies are facially neutral, *Larson* doesn't trigger strict scrutiny, and we proceed to *Lemon*.

*Lemon* presents us again with a multipart test: "In order to pass constitutional muster under the *Lemon* test, laws and government practices involving religion must: (1) have a secular legislative purpose; (2) have a principal or primary effect that neither advances nor inhibits religion; and (3) not result in excessive entanglement with religion or religious institutions." *Bonham v. D.C. Library Admin.*, 989 F.2d 1242, 1244 (D.C. Cir. 1993) (citing *Lemon*, 403 U.S. at 612-13). The chaplains naturally do not challenge the chaplaincy program as a whole; the Second Circuit has found it compatible with the Establishment Clause, in an opinion that does not precisely track *Lemon*. *Katcoff v. Marsh*, 755 F.2d

223 (2d Cir. 1985). Nor do the chaplains claim that the first or third element of *Lemon* cuts against the disputed selection procedures.

Rather they claim that the challenged policies have the "effect" of advancing particular denominations, which at least in this context entails application of the "endorsement" test. *Bonham*, 989 F.2d at 1245. That in turn takes us to the question of whether the selection policies *appear* to endorse religion in the eyes of a "reasonable observer," who "'must be deemed aware' of the 'history and context' underlying a challenged program." *Zelman v. Simmons-Harris*, 536 U.S. 639, 655 (2002) (quoting *Good News Club v. Milford Central School*, 533 U.S. 98 (2001)). As the policies themselves are facially neutral, the chaplains under this theory argue in effect that a reasonable observer, contemplating the results of the policies (as gathered in the chaplains' statistical evidence), would infer that the government had as a practical matter endorsed the liturgical denominations.

Assuming arguendo that it is proper to see the "reasonable observer" as a hypothetical person reviewing an array of statistics (the observer is already a judicial construct rather than a human being), the figures in this case would not lead him to perceive endorsement. Here the plaintiffs' statistics fail to show government endorsement of particular religions under the reasonable observer test for the same reason that, in the equal protection context, they failed to show intentional discrimination paralleling that of *Gomillion* or *Yick Wo*. The only new wrinkle, perhaps, is that we must impute to the reasonable observer either enough grasp of statistics not to be misled by the assertion of "statistical significance," or at least the modesty not to leap to a conclusion about the data without making an elementary inquiry on the subject. We feel confident that when reasonable observers find that the term means only that there

is little likelihood that the "discrepancy" is due to chance, they are most unlikely to believe that the policies convey a message of government endorsement.

Plaintiffs cite Title VII cases in which we found that statistically significant "disparities" in such matters as hiring and pay were enough to support district court findings of racial discrimination. See, e.g., *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395 (D.C. Cir. 1988); *Segar v. Smith*, 738 F.2d 1249, 1277-79, 1286-87 (D.C. Cir. 1984). But in these cases the court found liability only after being satisfied that the statistical evidence properly controlled for confounding variables. See, e.g., *Berger*, 843 F.2d at 1413-21 (reviewing potential non-discriminatory explanations); *id.* at 1419 (reasoning that the "entire notion of employing statistical proof is to eliminate non-discriminatory causes" of the disparities); *Segar*, 738 F.2d at 1274-77. Here, as we observed in the equal protection analysis, the chaplains point to no serious effort at such controls for any of their statistical comparisons. Accordingly, even assuming that a court could properly impute a belief in denominational favoritism to the reasonable observer simply on the basis of statistics that might satisfy a plaintiff's Title VII burden, the chaplains' data fail to meet that standard and thus fail to show a likelihood of success on the merits.

Finally, the chaplains point to our observation in *Bonham* that there is no "*de minimis* exception to traditional Establishment Clause analysis." 989 F.2d at 1245. But the *de minimis* defense that we rejected there was a notion that state actions could be excused, even though a reasonable observer would have regarded them as endorsing religion, so long as the action in question had only a trivial impact, for example, an action affecting "only a single day of the year." It was, obviously, not a suggestion that the "reasonable observer" should be deemed to spot "endorsement" on a bare surmise.

The district court's order denying the chaplains' motion for preliminary injunction is therefore

*Affirmed.*