# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 8, 2009        Decided November 17, 2009

No. 07-5080

SCOTT TOOLEY,
APPELLANT

v.

JANET ANN NAPOLITANO, HOMELAND SECURITY SECRETARY,
IN HER OFFICIAL CAPACITY, ET AL.,
APPELLEES

———

On Petition for Rehearing

———

*Lori Alvino McGill*, appointed by the court, argued the cause as *amicus curiae* in support of appellant. With her on the briefs were *Richard P. Bress* and *Gabriel K. Bell*, appointed by the court.

*Teal Luthy Miller*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief was *Douglas N. Letter*, Attorney.

Before: SENTELLE, *Chief Judge*, TATEL, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*:  This is the second time we review the district court's dismissal of the complaint in *Tooley v. Bush*, No. 06-306, 2006 WL 3783142 (D.D.C.2006). After our initial consideration of the case, in *Tooley v. Napolitano*, 556 F.3d 836 (D.C.Cir. 2009), the government sought and we granted a rehearing in light of *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

In *Iqbal* the Supreme Court applied its ruling on pleading standards in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007). See, e.g., 129 S.Ct. at 1949.  The government argues that *Iqbal* extended *Twombly*, thus invalidating a construction of *Twombly* previously advanced by this court in *Aktieselskabet AF 21 November 2001 v. Fame Jeans*, 525 F.3d 8 (D.C. Cir. 2008).  While we do not reject the government's argument, upon reflection we believe that we should affirm the district court in this case for reasons distinct from but not inconsistent with the holding in *Iqbal*.

According to his complaint, Scott Tooley phoned Southwest Airlines in the spring of 2002 to buy tickets to visit family members in Nebraska.  At the end of the call, after Tooley had provided Southwest with his name and contact information, the representative asked him if he had any "comments, questions, or suggestions."  Compl. ¶ 18.  Having been a candidate for elective office and worked on Capitol Hill, Tooley "[u]tiliz[ed] his security and public policy experience" to "suggest[] that the airline screen 100 percent of everything that went into the airline [sic] because he was incredulous that in the wake of the tragedies of September 11, 2001, cargo was, and still is not, fully screened."  *Id*. at ¶ 19. The representative "asked why such a course of action was necessary."  *Id*.  Tooley "was incredulous that he was ever asked such a question but patiently responded that without

proper security, the traveling public . . . was less safe due to the potential that those who wish to harm American citizens could put a bomb on a plane." *Id.* at ¶ 20. The Southwest representative "became alarmed and . . . repeatedly said, 'you said the "b" word, you said the "b" word.'" Affidavit of Scott Tooley (Sept. 1, 2006) ("Tooley Aff.") ¶ 7. Tooley attempted to explain to the representative that she had not understood him correctly, but she placed him on hold. After 20 minutes, Tooley hung up. *Id.*

According to Tooley, the ticket agent's seeming paranoia was not the end of the matter. Other events followed, which he initially ascribed to six high-level government officials. The three remaining in the suit, after a partial dismissal by Tooley, are the United States Attorney General, the Secretary of the Department of Homeland Security, and the Administrator of the Transportation Security Administration, all now sued solely in their official capacities (collectively, the "government"). See *Tooley*, 2006 WL 3783142, at *1 (detailing the defendants initially included in Tooley's complaint and his later dismissals).

In the fall of 2003, roughly a year and a half after his call to Southwest, Tooley "began to notice problematic phone connections, including telltale intermittent clicking noises, which still continue to this day." Compl. ¶ 21. He states, on information and belief, that his telephone problems were caused by illegal wiretaps, and that the defendants had such wiretaps placed on at least nine phones connected to him: his residential landline phone, his landline phone at his former residence, his cellular phone, his wife's cellular phone, the phones of his father, brother, sister, and in-laws, and his family's phone in Lincoln, Nebraska, where relatives from "France made calls from France to the home, where Mr.

Tooley was visiting his mother for the week." His complaint explains that these wiretaps were placed "in response to his innocent comments" to the Southwest representative. *Id.* at ¶¶ 21-22; Tooley Aff. ¶¶ 16-17. In an affidavit submitted after the complaint, Tooley added that from his "experience on Capitol Hill [he was] aware that wiretaps are pernicious and insidious because, as long as the phone line is plugged into the wall in one's home, those listening to the wiretaps can hear anything that goes on in the home." Tooley Aff. ¶¶ 8-9.

Tooley's complaint goes on to recount additional alleged government responses to his call to Southwest. Besides the wiretaps, the government subjected his and his wife's vehicles to "Radio Frequency Identification Tags ('RFITs') that monitor their vehicle movements," effectively subjecting him and his wife to "round-the-clock surveillance." Compl. ¶ 23. And Tooley has been subjected to "detention and strict search[es]" "every time that [he] traveled prior to filing this suit." Tooley Aff. ¶ 14.

Furthermore, in March 2005, in the week before and the week of a presidential visit to Tooley's home city of Louisville, after Tooley began to "routinely and specifically enumerate[] to [his family members] the serious nature of various Administration actions that are in no way flattering to the Administration . . . [,] an officer in a Ford Crown Victoria sat out in front of [Tooley's] home for approximately six (6) hours a day, as a threat of recrimination or persecution of political speech." Tooley Aff. ¶¶ 18-19.

In order to obtain more information regarding this alleged illegal surveillance, Tooley submitted several requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. See *Tooley*, 2006 WL 3783142, at *3-8 (detailing the various

FOIA requests). Believing that the government wrongly refused to comply with his requests, and seeking relief from the pattern of surveillance that he discerned, Tooley filed the present case in the district court. Counts I and II charge Fourth Amendment and constitutional right-to-privacy violations, respectively, through the alleged wiretapping, RFITs and "other surveillance activities." Compl. ¶¶ 52, 61. Count III claims that by engaging in all the above wrongs the defendants deprived Tooley of his First Amendment rights, "retaliating" against him for his remarks to the Southwest representative. *Id*. at ¶¶ 70-71. Count IV sought declaratory judgment under FOIA. *Id*. at ¶¶ 80-81.

The district court granted the government's motion for summary judgment on the FOIA count, *Tooley,* 2006 WL 3783142, at \*21, and Tooley does not challenge that decision. As to Counts I through III, the government moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) on the ground that Tooley lacked Article III standing. The district court addressed the standing arguments by dividing Tooley's allegations into three categories based on the character of the government's alleged unlawful behavior. The first two categories encompassed the alleged wiretapping and physical surveillance (including the claim that Defendants unlawfully placed an RFIT on Tooley's vehicle). *Tooley,* 2006 WL 3783142, at \*22. The court held that Tooley lacked Article III standing for these claims. It reasoned that "it is altogether possible" that Tooley was the subject of "entirely lawful wiretaps placed by state or local law enforcement agencies" and that Tooley could not show that it was a federal agent responsible for any of his alleged physical surveillance. *Id.* at \*23, 25.

The district court's third category was the unlawful placement of Tooley's name on a terrorist watch list. As to that, the court found Article III standing, but nonetheless dismissed Tooley's claim on the basis of another subject matter jurisdiction problem. *Tooley,* 2006 WL 3783142, at *26. Focusing solely on the Transportation Security Administration ("TSA") watch lists, the court found, in reliance on 49 U.S.C. §§ 46110(a), (c), that such lists "are incorporated into Security Directives issued by TSA . . . and Congress has vested exclusive jurisdiction to review such directives in the Court of Appeals." *Id.* Tooley appeals the dismissal of the first three counts.

A complaint may be dismissed on jurisdictional grounds when it "is 'patently insubstantial,' presenting no federal question suitable for decision." *Best v. Kelly*, 39 F.3d 328, 330 (D.C.Cir. 1994); see also *Bell v. Hood*, 327 U.S. 678, 683 (1946); cf. *Iqbal*, 129 S.Ct. at 1959 (Souter, J., dissenting) ("The sole exception to th[e] rule [that allegations must be credited at the pleading stage applies to] allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel."). A court need not assess whether a plaintiff has standing before dismissing on alternative jurisdictional grounds. See *Ruhrgas A.G. v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999) ("there is no unyielding jurisdictional hierarchy").

Here Tooley claims that about a year and a half after a conversation with an airline representative the government launched a massive surveillance program against him, involving wiretaps on at least nine phones, tracking devices on Tooley's and his wife's cars, an officer stationed outside his house for a week or more, and other unspecified acts of

surveillance, all continuing to this day, now seven years after the initial phone call. Moreover, as alleged by Tooley, the program was both sloppy—the wiretaps were greatly delayed after the precipitating event and all were technical busts, alerting the many victims by giving off clicking sounds—and well beyond the state of the art, enabling the snoopers "as long as the phone line is plugged into the wall in one's home . . . [to] hear *anything that goes on in the home*." Tooley Aff. ¶¶ 8-9 (emphasis added). The alleged motivation, moreover, was nothing if not bizarre: the defendants, people charged with protecting the country's security, allegedly acted out of a desire to "retaliate" against Tooley for his having offered a suggestion of additional measures that he claimed would enhance airline security. Alternatively, some of the surveillance was evidently to persecute him for remarks critical of the Bush administration, remarks likely indistinguishable from those of millions of Americans.

We recognize that in a nation of 300 million people, with millions of government employees, some are bound at any given moment to be acting unwisely, foolishly, counterproductively, mistakenly, maliciously, viciously, even inanely. But the particular combination of sloth, fanaticism, inanity and technical genius alleged here seems to us to move these allegations into the realm of claims "flimsier than 'doubtful or questionable'— . . . 'essentially fictitious,'" *Best*, 39 F.3d at 330 (citing *Hagans v. Lavine*, 415 U.S. 528, 537 (1974)), not realistically distinguishable from allegations of "little green men" of the sort that Justice Souter recognized in *Iqbal* as properly dismissed on the pleadings. *Iqbal*, 129 S.Ct. at 1959 (Souter, J., dissenting). Indeed, the allegations appear similar to those in a number of cases that district courts have dismissed for patent insubstantiality: that plaintiff was subjected to a campaign of surveillance and harassment

8

deriving from uncertain origins, either a long past employment by the FBI or a falling out with roommates even earlier, *Curran v. Holder*, 626 F. Supp. 2d 30, 33-34 (D.D.C. 2009); that a U.S. Senator orchestrated a program of hacking into plaintiff's personal computer, monitoring his phone calls, causing a power outage affecting half of Los Angeles, and tracking him by helicopter, *Lewis v. Bayh*, 577 F. Supp.2d 47, 54-55 (D.D.C. 2008); and that the Postal Service had conspired with two persons unconnected to the federal government (and bearing her surname) to keep her under surveillance in Postal Service premises by unlawful use of electronic devices, *Delaine v. United States Postal Service*, 2006 WL 2687019, *2 (D.D.C. 2006), *aff'd* No. 06-5321, 2007 U.S. App. LEXIS 7371, unpublished order (D.C. Cir. June 1, 2007). Because the allegations of Tooley's complaint constitute the sort of patently insubstantial claims dismissed in these and other cases, we conclude that the district court was correct in its judgment of dismissal.

The judgment of the district court is therefore

*Affirmed.*