# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 16, 2020      Decided January 15, 2021

No. 19-5328

BILAL ABDUL KAREEM,
APPELLANT

v.

GINA CHERI HASPEL, DIRECTOR OF THE CENTRAL
INTELLIGENCE AGENCY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00581)

*Tara J. Plochocki* argued the cause for appellant. With her on the briefs were *Eric L. Lewis* and *Jeffrey D. Robinson*.

*Joseph Margulies* was on the brief for *amici curiae* Former State and Federal Prosecutors in support of appellant.

*Santha Sonenberg* was on the brief for *amicus curiae* Russian Expert Professor William Bowring in support of appellant.

*Hyland Hunt* and *Ruthanne M. Deutsch* were on the brief for *amici curiae* Victims and Families of Victims of State-

Sponsored Violence in Northern Ireland in support of appellant.

*A. Richard Ellis* was on the brief for *amicus curiae* Professor Brenner Fissell in support of appellant.

*Bradley Hinshelwood*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *H. Thomas Bryon, III*, Attorney.

Before: SRINIVASAN, *Chief Judge*, HENDERSON and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Plaintiff Bilal Abdul Kareem is a United States citizen who works in Syria as a journalist. Because five aerial bombings allegedly occurred in Kareem's vicinity in Syria during the summer of 2016, Kareem claims that he has mistakenly been placed on a purported list of individuals the United States has determined are terrorists who may be targeted and killed. Kareem seeks a declaration that his alleged inclusion on the purported list is unconstitutional and an injunction barring the United States government from including him on the purported list without providing additional procedural protections. The district court, after concluding that Kareem had established standing sufficient to survive a motion to dismiss and that some of Kareem's claims were justiciable, dismissed the complaint pursuant to the application of the state secrets privilege. The critical question before us is whether Kareem has Article III standing to seek prospective relief as, without Kareem's standing, we lack jurisdiction to consider the other issues raised in his appeal. The complaint fails to allege plausibly that any of the five aerial bombings were attributable to the United

States and specifically targeted Kareem. Accordingly, his standing theory does not cross the line from conceivable to plausible. Thus, we vacate the district court's dismissal and remand with instructions to dismiss the complaint on the ground that Kareem lacks Article III standing.

## I. BACKGROUND

### A. Facts

Kareem works as a journalist in Syria for On the Ground Network (OGN), a news organization that provides "access to the views of the anti-Assad rebels." Compl. at ¶ 45, *Kareem v. Haspel*, 412 F. Supp. 3d 52 (D.D.C. 2019) (No. 17-cv-581), ECF No. 1. Kareem's complaint alleges that he "posts interviews with rebel fighters on social media outlets" and "is one of the only Western journalists in the region given access to these individuals to interview them." *Id.*

The complaint further alleges that, while performing his work as a journalist in Syria in 2016, Kareem "narrowly missed being hit by military strikes" five different times. *Id.* at ¶ 46. Four of the alleged strikes occurred in June 2016. First, in Idlib City, after Kareem "heard aircraft approaching," an airstrike hit OGN's office building. *Id.* at ¶ 47. Second, after Kareem heard "drones buzzing above," a strike hit an area near Aleppo where Kareem and his cameraman had recently finished conducting an interview. *Id.* at ¶ 48. Third, "[t]he vehicle of Kareem and his staff was struck and destroyed by a drone-launched Hellfire missile." *Id.* at ¶ 49. At the time of the third strike, Kareem was sitting in a different, nearby vehicle which was "hurled into the air by the force of the blast" and "flipped upside down." *Id.* Fourth, a "missile" again hit OGN's office building in Idlib City. *Id.* at ¶ 50. Fifth, in August 2016, in an "area [that] had recently changed hands from [Syrian] government control to rebel hands," Kareem and his co-workers were in his car "when

there was a huge blast only yards away from the car." *Id.* at ¶ 51.

As a result of the five near-miss experiences in a three-month period, Kareem alleges "[u]pon information and belief" that he "was the specific target" of each of the strikes and that his name is included on a list of targets for U.S. military action.[1] *Id.* at ¶ 52. According to the complaint, the United States has publicly disclosed that it "conducts lethal strikes targeted at individuals, using remotely piloted aircraft, among other weapons, and that targets are selected . . . as a result of a 'process' in which targets are nominated by one or more defendants." *Id.* at ¶ 55. On May 22, 2013, then-President Barack Obama issued a document that outlined a process for designating individuals as terrorist targets approved for lethal action (Presidential Policy Guidance). *Zaidan v. Trump*, 317 F. Supp. 3d 8, 15 (D.D.C. 2018) (citing Compl. at ¶ 57).[2] According to the complaint, the Presidential Policy Guidance includes guidance on the "necessary preconditions for taking lethal action" and on the designation of individuals as targets based only on "metadata" collected from electronic devices (*i.e.*, without knowing the target's identity). *Id.* (citing Compl. at ¶¶ 61, 63).

Because of Kareem's proximity to the five aerial bombings described in the complaint, Kareem alleges that his

---

[1] Kareem refers to the U.S. government's alleged list of terrorist targets approved for lethal action as the "Kill List." *Id.* at ¶ 1.

[2] *See also* Procedures for Approving Direct Action Against Terrorist Targets Located Outside the United States and Areas of Active Hostilities (May 22, 2013), https://www.justice.gov/oip/foia-library/procedures_for_approving_direct_action_against_terrorist_targets/download. On August 6, 2016, a redacted version of the Presidential Policy Guidance was declassified and made public. *Zaidan*, 317 F. Supp. 3d at 15.

name is on a list of individuals the United States has determined are terrorists and may be targeted and killed. *See Kareem v. Haspel*, 412 F. Supp. 3d 52, 55 (D.D.C. 2019). Kareem alleges that he was never notified of his inclusion on the list nor provided an opportunity to challenge his inclusion.

## B. Procedure

In March 2017, Kareem filed suit against the Central Intelligence Agency (CIA), the Department of Defense (DOD), the Department of Homeland Security (DHS), the Department of Justice (DOJ) and the United States, as well as the CIA Director, the DOD and DHS Secretaries, the Attorney General, the National Security Advisor and the Director of National Intelligence (DNI), all in their official capacities.[3] The complaint alleges that Kareem's purported inclusion on a list of terrorist targets approved for lethal force violated the Administrative Procedure Act, 5 U.S.C. §§ 701–706. It asserts six claims:

- Count 1: Inclusion of Kareem on the Kill List was arbitrary, capricious and an abuse of discretion.

- Count 2: Inclusion of Kareem on the Kill List was not in accordance with law.

---

[3] Kareem filed suit with a co-plaintiff, Ahmad Muaffaq Zaidan. The two sued President Trump in addition to the other defendants but the district court dismissed those claims because the President is not an agency subject to the Administrative Procedure Act. *Zaidan*, 317 F. Supp. 3d at 22; *see Franklin v. Massachusetts*, 505 U.S. 788, 796, 800–801 (1992). The district court also dismissed Zaidan's claims for lack of standing, *Zaidan*, 317 F. Supp. 3d at 18–19, and he did not appeal. Accordingly, Kareem is the sole remaining plaintiff.

- Count 3: Inclusion of Kareem on the Kill List exceeded the defendants' statutory authority.

- Count 4: Inclusion of Kareem on the Kill List violated due process because Kareem was not provided notice nor given an opportunity to challenge his inclusion.

- Count 5: Inclusion of Kareem on the Kill List violated the First Amendment because it "has the effect of restricting and inhibiting [his] exercise of free speech and [his] ability to function as [a] journalist[] entitled to freedom of the press." Compl. at ¶ 85.

- Count 6: Inclusion of Kareem on the Kill List violated the Fourth and Fifth Amendments because it constituted an illegal seizure and sought to "deprive [Kareem] of life without due process of law." *Id.* at ¶ 91.

Kareem seeks (1) a declaration that his inclusion on the terrorist target list is unlawful and/or unconstitutional, (2) an injunction barring the defendants from including him on the terrorist target list without providing additional procedural protections and (3) an injunction requiring the defendants to remove him from the terrorist target list and/or stop targeting him for lethal action.

On June 5, 2017, the defendants moved to dismiss, arguing that Kareem lacked standing and that his claims presented non-justiciable political questions. On June 13, 2018, the district court granted in part and denied in part the motion to dismiss. *See Zaidan*, 317 F. Supp. 3d at 13. Specifically, the district court concluded that (i) Kareem had plausibly alleged standing

sufficient to survive a motion to dismiss, *id.* at 19–21; (ii) Counts 1, 2 and 3 were non-justiciable under the political question doctrine, *id.* at 25–26; and (iii) Counts 4, 5 and 6 were justiciable under the political question doctrine, *id.* at 26–29.

As relevant here, the district court found that "[a]ccepting all well-pled allegations as true, Mr. Kareem has plausibly alleged that he was in 2016 a target on the Kill List with evidence that makes it 'more than a sheer possibility.'" *Id.* at 20 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The district court reached its conclusion on the basis that Kareem "alleges that the United States engages in targeted drone strikes, that he has been the near victim of a military strike on five occasions (at least one of which included the use of a drone), and that he is a journalist who is often in contact with rebel or terrorist organizations." *Id.* (footnote omitted). The district court acknowledged that "[d]efendants set forth other plausible alternatives, such as the fact that Mr. Kareem could have been targeted by Syria for reporting on anti-Assad efforts," but concluded that "their argument does not make it implausible that the attacks were a result of U.S. action." *Id.*

After the district court's resolution of the motion to dismiss, the parties discussed potential pre-trial resolution. *Kareem*, 412 F. Supp. 3d at 55. "Despite two months of discussions, the parties were unable to resolve the litigation." *Id.* At that point, Kareem asked to begin discovery and the defendants informed the district court that they were considering a second motion to dismiss based on the state secrets privilege.

On January 30, 2019, the defendants filed a motion to dismiss pursuant to the state secrets privilege. *Id.* at 56. They submitted public affidavits from then-Acting Secretary of Defense Patrick Shanahan and then-DNI Daniel Coats,

addressing the invocation of the state secrets privilege. The defendants also submitted classified declarations from the same officials that provided the district court, *in camera*, with additional information relevant to the assertion of the privilege.

On September 24, 2019, the district court dismissed the complaint pursuant to the state secrets privilege. *Id.* at 62. First, it found that the defendants satisfied the three procedural requirements for invoking the state secrets privilege.[4] *Id.* at 56–57. Second, the district court determined that "the state secrets privilege bars disclosure of the requested information to Mr. Kareem because disclosure would present a reasonable danger to national security." *Id.* at 61.[5] Third, the district court

---

[4] Specifically, (i) the privilege was asserted by the United States government; (ii) the claim of privilege was made through formal declarations by the heads of the agencies responsible for the information; and (iii) the agency heads personally reviewed the relevant information and determined that invoking the state secrets privilege was warranted. *Id.* at 56–57.

[5] Kareem had sought discovery on three topics: (1) whether the United States has targeted Kareem for lethal force and, if so, on what basis; (2) the process the United States used to target Kareem and what process would be used in the event he remains a target; and (3) whether the United States targeted Kareem in the airstrikes alleged in the complaint. *Id.* at 57–58. Upon reviewing the public and classified declarations, the district court found that "disclosure of [the privileged] information . . . and the means, sources and methods of intelligence gathering in the context of this case would undermine the government's intelligence capabilities and compromise national security." *Id.* at 58 (alteration in original) (quoting *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1204 (9th Cir. 2007)). It noted that disclosure could (1) "hinder the United States' military operations in Syria"; (2) pose a threat to intelligence sources and methods; and (3) result in an individual's altering his activities or otherwise evading detection or capture based on the disclosed information. *Id.*

concluded that application of the state secrets privilege required dismissal of Kareem's complaint because "there is no feasible way to litigate [the United States'] alleged liability without creating an unjustifiable risk of divulging state secrets." *Id.* (alteration in original) (quoting *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1087 (9th Cir. 2010)).

Kareem timely appealed the district court's dismissal. On appeal, Kareem argues that the Shanahan and Coats declarations do not justify non-disclosure of the requested information; and even if they do, the state secrets privilege cannot foreclose Kareem's exercise of his Fifth Amendment right to due process. The defendants defend the district court's conclusion that the state secrets privilege required dismissal. They also reassert their arguments (1) that the complaint's allegations are insufficient to establish standing and (2) that Kareem's claims present non-justiciable political questions.

## II.  ANALYSIS

We review *de novo* a district court's determination that a plaintiff has standing. *See Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). Here, the complaint fails to allege a sufficient factual basis to create a plausible inference that the described missile attacks were attributable to the United States and specifically targeted Kareem. Accordingly, Kareem has failed to establish standing and we vacate and remand for dismissal on that basis.[6]

Article III limits the jurisdiction of federal courts to "Cases" or "Controversies." *See* U.S. Const. art. III, § 2, cl. 1. As the United States Supreme Court has made clear, one

---

[6] Because we determine that Kareem has not established standing, we do not reach the applicability of the political question doctrine or the state secrets privilege to this case.

"essential and unchanging part of the case-or-controversy requirement" is that a plaintiff must establish Article III standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff establishes Article III standing by showing that he seeks relief from an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). Because Kareem's complaint "seeks prospective declaratory and injunctive relief, he must establish an ongoing or future injury that is 'certainly impending'; he may not rest on past injury." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Clapper*, 568 U.S. at 409). Importantly, the standing inquiry is "especially rigorous when reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," particularly "in the fields of intelligence gathering and foreign affairs." *Clapper*, 568 U.S. at 408–09 (internal quotations omitted).

Because standing is a threshold jurisdictional requirement, it may be questioned at any time during the litigation. "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Consequently, at the motion to dismiss stage, we "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," *Arpaio*, 797 F.3d at 19, but "[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice," *id.* (alteration in original) (quoting *Iqbal*, 556 U.S. at 678). We do not assume the truth of legal conclusions, *Iqbal*, 556 U.S. at 678, nor do we "accept

inferences that are unsupported by the facts set out in the complaint," *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007). Accordingly, "'[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim [of standing] that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In this respect, "the plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

The complaint alleges upon information and belief that the U.S. government has designated Kareem as a terrorist target approved for lethal force. We have recognized that "pleadings on information and belief are permitted when 'the necessary information lies within defendants' control.'" *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994) (quoting *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 645 (3d Cir. 1989)). In such circumstances, however, we also require that the allegations based on information and belief "be accompanied by a statement of the facts upon which the allegations are based." *Id.*; *see also Tooley v. Napolitano*, 586 F.3d 1006, 1007–1008, 1010 (D.C. Cir. 2009) (dismissing complaint where alleged facts did not plausibly support inference that government had surveilled plaintiff, despite plaintiff's allegation "on information and belief" that at least nine telephones connected to him had been illegally wiretapped). Accordingly, whether Kareem has alleged sufficient facts to establish standing turns on whether the complaint's allegations create a plausible inference that the U.S. government has designated Kareem as a terrorist target approved for lethal force.

Kareem argues that the complaint's allegations regarding his proximity to five missile strikes over a three-month period in Syria in 2016 make it plausible that the U.S. government has

targeted him for lethal force. The defendants, on the other hand, argue that Kareem lacks standing because no facts plausibly establish (1) that the five missile strikes were attributable to the United States or (2) that the five missile strikes specifically targeted Kareem. We agree with the defendants. Kareem's allegation that the United States has targeted him for lethal action "stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 557.

Kareem does not and could not plausibly dispute the basic facts that, in the summer of 2016, the Syrian civil war involved numerous factions, including pro-Assad government forces, anti-Assad opposition groups, Kurdish factions, the Islamic State (ISIS) and al-Qaeda-linked fighters. *See* Cong. Rsch. Serv., RL33487, *Armed Conflict in Syria: Overview and U.S. Response* 9–11 (June 20, 2017).[7] In addition, foreign

---

[7] It is well-settled that we may consider materials outside the pleadings to determine our jurisdiction. *Haase v. Sessions*, 835 F.2d 902, 908 (D.C. Cir. 1987) (court may "undertake an independent investigation to assure itself of its own subject matter jurisdiction" in considering standing under Rule 12(b)(1)). In so doing at the motion to dismiss stage, we "must still 'accept all of the factual allegations in [the] complaint as true.'" *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253–1254 (D.C. Cir. 2005) (alteration in original) (quoting *United States v. Gaubert*, 499 U.S. 315, 327 (1991)). We may also take judicial notice of "'a fact that is not subject to reasonable dispute' if it either 'is generally known within the trial court's territorial jurisdiction' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017) (quoting Fed. R. Evid. 201(b)). We take judicial notice of facts regarding the Syrian conflict that Kareem's complaint does not dispute because they are generally known and can be readily determined from reliable sources, such as the Congressional Research Service and State Department reports. *See Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016) (taking judicial notice of agency

governments, including Russia, Iran, Turkey and the United States, were providing direct military assistance to different factions at the time. *Id.* at 11.

Nor is there any dispute that Idlib City and Aleppo, the areas where Kareem alleges the five airstrikes occurred, were major battlefields in the Syrian conflict during the summer of 2016. Specifically, Idlib City, the site of OGN's office and of two of the alleged airstrikes, was captured by anti-Assad forces with the support of al-Qaeda-linked fighters in 2015. *Id.* Hostilities between the Syrian government and opposition forces continued in the area throughout 2016.

Similarly, Aleppo, Syria's then-most populous city, was the center of intense battles throughout the summer of 2016. The Syrian government cut off access to opposition-held eastern Aleppo in July 2016, only for al-Qaeda linked fighters to retake territory in the southwest of the city and create an access point to besieged eastern Aleppo in August 2016. *See* Carla E. Humud et al., Cong. Rsch. Serv., RL33487, *Armed Conflict in Syria: Overview and U.S. Response* 8 (Sept. 28, 2016). Then, in September 2016, "Syrian and Russian forces began an intense aerial bombardment of opposition-held areas of eastern Aleppo." *Id.* at 8–9.

Unquestionably, numerous actors were involved in the Syrian conflict in the specific areas identified in Kareem's complaint during the specific time period the alleged airstrikes occurred. And the complaint does not contain any factual allegations that explicitly link the United States to any of the five alleged airstrikes. In attempting to link the United States to the five airstrikes, the complaint instead relies primarily on the assertion that "[d]efendants have admitted that the United

------

report); *Youkhana v. Gonzales*, 460 F.3d 927, 932 (7th Cir. 2006) (taking judicial notice of State Department country report on Iraq).

States conducts lethal strikes targeted at individuals, using remotely piloted aircraft, among other weapons." Compl. at ¶ 55. A general allegation that the United States targets individuals using drones is plainly insufficient to establish plausibly that, in a war-torn area of Syria in the summer of 2016, the United States was responsible for five airstrikes in Kareem's vicinity and that Kareem was the specific target of those airstrikes.

As for specific allegations, the complaint's description of the third airstrike comes the closest to alleging U.S. involvement. It claims that an OGN vehicle "was struck and destroyed by a drone-launched Hellfire missile." *Id.* at ¶ 49. Although not alleged in the complaint, Kareem's appellate brief asserts that a Hellfire missile is "the missile attached to most armed U.S. drones." Appellant Br. 9. The defendants respond that the Hellfire missile system "is employed by numerous U.S. allies." Appellees Br. 16. The parties provide no support for their respective assertions.

Even assuming *arguendo* that the United States was the only actor in Syria using Hellfire missiles in 2016, Kareem's allegation nonetheless suffers from two fatal flaws: (1) we cannot give the allegation material weight because Kareem has apparently retreated from the assertion in this litigation and (2) it provides no plausible inference that Kareem was the specific target of the airstrike. First, the complaint alleges that the third airstrike involved "a drone-launched Hellfire missile." But Kareem's appellate briefing undermines that factual assertion. Kareem's opening brief categorizes this airstrike as coming "in the form of *what appeared to be* a Hellfire missile." Appellant Br. 9 (emphasis added). And Kareem's reply brief explains that Kareem "*believed* [the third alleged airstrike] was a Hellfire missile of the type used by the United States because of its strength and the damage it caused." Reply Br. 10. At oral

argument, Kareem's counsel conceded the impossibility of knowing "with any kind of certainty . . . that it was a Hellfire missile" at this stage of the litigation. Tr. of Oral Arg. at 5:1–4, *Kareem v. Haspel* (No. 19-5328) (Nov. 16, 2020).[8] Thus, the allegation that the third airstrike involved a Hellfire missile is nothing more than a conclusory assertion made on an equivocal factual basis and is therefore afforded little, if any, weight in the plausibility analysis. *See Iqbal*, 556 U.S. at 679 ("[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.").

Moreover, were we to construe Kareem's conclusory Hellfire missile allegation as a factual inference based on the damage from the blast, the further necessary inference that the missile was attributable to the United States would still be unreasonable. The United States was not the only actor using powerful missiles in Syria in 2016. Indeed, Syrian and Russian forces carried out "an intense aerial bombardment of opposition-held areas of eastern Aleppo" in 2016. *See* Carla E. Humud et al., Cong. Rsch. Serv., RL33487, *Armed Conflict in Syria: Overview and U.S. Response* 8 (Sept. 28, 2016). Specifically, U.S. and European officials "accused Russia of using bunker-buster bombs and incendiary munitions against civilians in Aleppo." *Id.* at 9 (footnote omitted). Bunker-buster bombs are "munitions dropped from aircraft that are designed to penetrate hardened targets or targets buried deep underground. Such munitions are usually characterized by relatively large explosive charges, specially reinforced detonating mechanisms, an[d] precision guidance systems in order to maximize the probability of destroying particularly

---

[8] *See also* Reply Br. 10 ("It is unclear how any person could positively identify who launched a missile while it is being fired at him, or the type of missile launched.").

difficult targets." *Id* at 9 n.18. Accordingly, the unsupported Hellfire missile allegation does not provide a plausible basis to infer that the United States launched the missile described in the third alleged airstrike.

Second, Kareem's factual allegations are insufficient to establish a plausible inference that the "drone-launched Hellfire missile" targeted *him*, even assuming *arguendo* the United States launched the missile. As noted, the area surrounding Aleppo, where the airstrike is alleged to have occurred, experienced intense battles between the Syrian government (and its allies) and opposition forces during the summer of 2016. The complaint contains no allegation that the airstrike that struck an OGN vehicle on June 26, 2016 was the only missile to hit the area that day. And Kareem was not the only person in the vicinity of the airstrike. OGN staff were present and the missile struck the OGN vehicle, not the pick-up truck in which Kareem was sitting. Accordingly, the inference that the alleged "drone-launched Hellfire missile" specifically targeted Kareem is an unreasonable inference.

The other four alleged airstrikes suffer from the same fatal defect—the absence of any plausible inference that they *specifically* targeted Kareem. They either targeted OGN's office building or hit areas where Kareem was accompanied by other people. *See* Compl. at ¶ 47 ("strike hit the OGN building"); ¶ 48 ("Kareem was with his cameraman . . . . [and] a local man who owned a supermarket"); ¶ 50 ("OGN [office] was targeted"); ¶ 51 ("Kareem and three other people from OGN were driving in Kareem's car" when a blast occurred nearby). And there is no allegation that they were the only people in the area when the airstrikes occurred. Simply put, the necessary inference that at least one of the alleged airstrikes was (1) attributable to the United States and (2) specifically

targeted Kareem is implausible on the face of the complaint's allegations.

Moreover, Kareem's factual allegations are "not only compatible with, but indeed [are] more likely explained by" attacks carried out by pro-Syrian government actors. *Iqbal*, 556 U.S. at 680. First, Kareem is part of a news organization dedicated to providing access to the views of anti-Syrian government rebels. Second, two of the alleged airstrikes hit the news organization's offices. And third, one of the airstrikes occurred in an area that had recently shifted from Syrian government control to rebel hands. In its *Syria 2016 Human Rights Report*, the United States Department of State noted that the Syrian government has used "indiscriminate and deadly force against civilians," including through "air and ground-based military assaults." U.S. Dep't of State, *Syria 2016 Human Rights Report* 2 (2017). And the United Nations Commission of Inquiry on Syria has reported that the Syrian government "routinely targeted and killed both local and foreign journalists."[9] *Id.* at 29. These facts do not eliminate the *possibility* that the five airstrikes alleged in the complaint were attributable to the United States and specifically targeted Kareem. But they do make the necessary inferences *implausible*. To conclude otherwise would indicate that any person who uses an electronic device, is in the vicinity of multiple explosions in a war zone and has had some contact with local militants can plausibly allege that the United States has targeted him for lethal force. Article III of the United States Constitution precludes such a result. "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court

---

[9] Specifically, according to the State Department, Reporters Without Borders has estimated that 56 journalists were killed in Syria between 2011 and September 2016, including seven during 2016. *Id.*

jurisdiction to actual cases or controversies." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976). Here, "[t]he complaint . . . simply do[es] 'not permit the court to infer more than the mere possibility of misconduct,' and this is insufficient to show that" Kareem has the requisite standing. *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679).

For the foregoing reasons, we vacate the district court's dismissal pursuant to the state secrets privilege and remand with instructions to dismiss the complaint on the ground that Kareem lacks Article III standing.

*So ordered.*