# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 6, 2023          Decided April 18, 2023

No. 22-5125

AIR EXCURSIONS LLC,
APPELLANT

v.

JANET L. YELLEN, IN HER OFFICIAL CAPACITY AS SECRETARY
OF THE UNITED STATES DEPARTMENT OF THE TREASURY AND
UNITED STATES DEPARTMENT OF THE TREASURY,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-01769)

---

*Kenneth S. Nankin* argued the cause and filed the briefs for appellant.

*Adam C. Jed*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Michael S. Raab*, Attorney.

Before: HENDERSON and RAO, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Air Excursions, LLC provides air transportation services in Alaska and the Pacific Northwest. It claims that the United States Department of Treasury (Treasury) erroneously disbursed pandemic relief funds to a competitor airline and challenges that disbursement as unlawful under the Administrative Procedure Act (APA). *See* 5 U.S.C. § 706(2)(A). We conclude, however, that Air Excursions lacks Article III standing to bring this suit. Accordingly, we vacate the district court's order dismissing the complaint on the merits and remand with instructions to dismiss for lack of jurisdiction.

**I.**

The Coronavirus Aid, Relief and Economic Security (CARES) Act was designed to help businesses weather the pandemic. *See* Pub. L. No. 116-136, 134 Stat. 281 (2020). The Act authorized the Treasury to disburse up to $25 billion to "passenger air carriers" through the Payroll Support Program (PSP). *See* 15 U.S.C. § 9072(a)(1). The Act granted the Treasury significant discretion to distribute PSP funds "in such form" and "on such terms and conditions . . . as the Secretary determines appropriate." *Id.* § 9073(b)(1)(A). The only requirement was that a recipient use the funds exclusively for "the continuation of payment of employee wages, salaries, and benefits." *Id.* § 9072(a). If an air carrier accepted PSP funds but nonetheless furloughed workers, the Act gave the Treasury discretionary authority to "clawback . . . any financial assistance" provided the air carrier. *Id.* § 9073(b)(1)(A).

The Congress later authorized two additional relief packages that allowed the Treasury to disburse more money to passenger air carriers during the pandemic. First, the Consolidated Appropriations Act (CAA) authorized the

Treasury to disburse an additional $15 billion to passenger air carriers for worker support. *See* Pub. L. No. 116-260, tit. IV, § 402, 134 Stat. 1182, 2053 (2020). Second, the American Rescue Plan Act (ARP) authorized another $14 billion under the same terms and for the same purpose. *See* Pub. L. No. 117-2, § 7301, 135 Stat. 4, 106 (2021). Both statutes incorporated the CARES Act's grant of broad discretion to the Treasury in disbursing the funds. *See* 15 U.S.C. §§ 9092(a), 9093(b), 9141(b).

One air carrier that applied for PSP relief was Corvus Airlines, Inc., a small airline servicing certain commuter routes between Anchorage and Southwest Alaska. But just two days after it applied for PSP disbursements, Corvus petitioned for relief under Chapter 11 of the United States Bankruptcy Code and ceased operations. *See* 11 U.S.C. § 301 (describing filing of petition); *id.* ch. 11. While the bankruptcy proceedings were pending, the Treasury approved Corvus's application for PSP funds and the bankruptcy court gave Corvus leave to enter a PSP Agreement authorizing the disbursement. The PSP Agreement allowed disbursement only to the "Recipient," which it defined as the "Signatory Entity"—Corvus—and its "successors" and "assigns." First Am. Compl. ¶¶ 21–22 (J.A. 161). The Agreement further provided that the Recipient could not "pledge, mortgage, encumber, or otherwise assign" any interest in the PSP funds to any "other Person without the express written approval of [the] Treasury." *Id.* ¶ 23 (J.A. 161). Pursuant to the PSP Agreement and subsequent agreements incorporating it, Corvus received three disbursements totaling $30 million, as authorized by the CARES Act, the CAA and the ARP.

By the time the Treasury disbursed any funds, Corvus's bankruptcy sale was already complete. Through an Asset Purchase Agreement, Corvus opted to sell its business to

multiple entities. One of the buyers—FLOAT Shuttle, Inc. (FLOAT)—purchased for $8 million several of Corvus's airplanes, all of its capital stock and "all right, title, and interest . . . in and to any and all federal loans, grants, subsidies, or other forms of funding . . . including, without limitation, to monies or rights to monies pursuant to the [CARES Act]." *Id.* ¶ 32 (J.A. 163). In approving the Asset Purchase Agreement, the bankruptcy court clarified that FLOAT "is not a successor to [Corvus] or [its] estate[] by reason of any theory of law or equity, and the Transaction does not amount to a consolidation, merger, or *de facto* merger" between Corvus and FLOAT. *Id.* ¶ 33 (J.A. 163–65). After the bankruptcy sale, FLOAT began offering air passenger transportation on certain routes between Anchorage and Southwest Alaska that Corvus had once served.

Air Excursions planned to operate in that same market and began accepting charter reservations for the same routes that FLOAT serves.[1] Air Excursions claims that the Treasury should not have disbursed any PSP funds to the post-bankruptcy Corvus entity. According to Air Excursions, FLOAT was the actual recipient of the funds because it purchased the right to Corvus's PSP disbursements in bankruptcy and the Treasury's three disbursements thus violated the PSP Agreement, which specified Corvus as the "Recipient" of the funds and prohibited Corvus from assigning any interest in those funds without the Treasury's written approval. They also ran counter to the bankruptcy court's order, which declared that FLOAT is not Corvus's successor in interest. Air Excursions further alleged that FLOAT's receipt of the funds allowed it to engage in anticompetitive behavior— first, by charging below-market fares for its services and,

---

[1] Air Excursions is an Alaska LLC doing business as "Alaska Seaplanes." Air Excursions also applied for and received PSP disbursements.

second, by negotiating a sublease for airport gate space with Air Excursions in bad faith, costing Air Excursions a lucrative business opportunity. This conduct, according to the complaint, harmed Air Excursions because it enabled FLOAT to "capture market share, prevent entry of competitors and impede competitors in the market." *Id.* ¶ 47 (J.A. 168).

Relying on a theory of competitor standing, Air Excursions brought this action under the APA to challenge the Treasury's disbursement of PSP funds to FLOAT. *See* 5 U.S.C. § 706(2)(A). To remedy its alleged competitive injuries, Air Excursions sought a declaration that the Treasury's disbursements were unlawful and an injunction requiring the Treasury to "take remedial measures," *see* First Am. Compl. ¶ b (J.A. 171), including its "clawback" authority pursuant to 15 U.S.C. §§ 9073 and 9093, and to refrain from disbursing any additional funds to FLOAT. The Treasury moved to dismiss, both for lack of standing and on the merits.

The district court held that Air Excursions had competitor standing but dismissed the complaint on the merits. *See Air Excursions, LLC v. Yellen*, 598 F. Supp. 3d 4, 13–18 (D.D.C. 2022). It concluded that the CARES Act and its progeny commit the terms of PSP disbursements to agency discretion and thus Air Excursions' challenge is not reviewable under the APA. *Id.* at 13–15; *see also* 5 U.S.C. § 701(a)(2) (excepting from APA reviewability challenges to "agency action" that are "committed to agency discretion by law"); *Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009) ("the court has jurisdiction" under 28 U.S.C. § 1331 to consider challenges to "agency action committed to agency discretion by law" but "will properly grant a motion to dismiss the complaint for failure to state a claim"). The court further concluded that, even if the statutes or the PSP Agreement provide a meaningful standard against which to review the allegations, Air Excursions

"misconstrue[d]" the bankruptcy order's "no-successor" provision and its complaint failed to raise a plausible inference that FLOAT's receipt of funds violated the PSP Agreement's "no-assignment" provision. *See Air Excursions*, 598 F. Supp. 3d at 15–18. Air Excursions timely appealed.

**II.**

We review *de novo* the district court's determination that Air Excursions has Article III standing to sue. *See Kareem v. Haspel*, 986 F.3d 859, 865 (D.C. Cir. 2021). As detailed *infra*, the complaint fails to support the claim that the Treasury's disbursement of PSP funds to FLOAT caused Air Excursions a competitive injury redressable by a favorable judicial decision.

Article III standing is an "essential and unchanging part" of the Constitution's case-or-controversy requirement. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see also* U.S. CONST. art. III, § 2, cl. 1. To establish Article III standing, a plaintiff must show that it "suffered or [is] imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014); *see also Lujan*, 504 U.S. at 560. A plaintiff must support allegations of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Kareem*, 986 F.3d at 865 (quoting *Lujan*, 504 U.S. at 561).

"[A]t the motion to dismiss stage, we 'accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor.'" *Id.* (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)). But we do not assume the truth of legal conclusions, *see*

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), or "accept inferences that are unsupported by the facts set out in the complaint," *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007); *see also Kareem*, 986 F.3d at 865–66 ("[T]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice." (quoting *Arpaio*, 797 F.3d at 19) (second alteration in *Arpaio*)). Setting "mere conclusory statements" aside, the complaint must contain "sufficient factual matter, accepted as true," to support an inference of standing "'that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard requires "more than a sheer possibility" that the plaintiff has standing to sue. *Id.* Thus, if "a complaint pleads facts that are 'merely consistent with'" the plaintiff's theory of standing, "it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

## A.

We begin "by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679; *see also Twombly*, 550 U.S. at 555. Air Excursions asserts that, by distributing PSP funds to FLOAT, the Treasury "improperly subsidized FLOAT with a windfall that it did not earn and was not entitled to receive." First Am. Compl. ¶ 50 (J.A. 169). These funds, according to the complaint, allowed FLOAT to approach its sublease negotiations with Air Excursions in bad faith and charge below-market fares for its services, both of which caused Air Excursions a competitive injury by impeding its entry into the Alaskan air passenger transport market and impairing its ability to compete in that market once entered. But the causal link between the Treasury's disbursement of PSP funds and FLOAT's alleged anticompetitive behavior rests entirely on

"general averments" and "conclusory allegations," *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)), the truth of which we do not assume in evaluating whether the complaint satisfies the traceability element of Article III standing, *see Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

First, Air Excursions makes only conclusory allegations connecting FLOAT's receipt of PSP funds with the outcome of the sublease negotiations. The complaint avers that FLOAT's receipt of PSP funds "allow[ed]" it to "impede and delay" Air Excursion's market entry by failing to negotiate a sublease for airport gate space in good faith. First Am. Compl. ¶ 50 (J.A. 169). Granted, Air Excursions' causal theory is possible—the infusion of PSP capital may have given FLOAT the financial means to deny itself a potentially lucrative source of rental income. But "[t]he plausibility standard . . . asks for more than a sheer possibility that" the challenged action caused the injury alleged. *Iqbal*, 556 U.S. at 678. And FLOAT's refusal to sublease gate space is "not only compatible with, but indeed [is] more likely explained by" FLOAT's obvious incentive not to sublease to a competitor, independent of its receipt of PSP disbursements. *Kareem*, 986 F.3d at 869 (quoting *Iqbal*, 556 U.S. at 680); *accord Twombly*, 550 U.S. at 550–51, 566.

Second, Air Excursions similarly fails to connect FLOAT's receipt of PSP disbursements with its pricing decisions. The complaint avers only that "Treasury's improper subsidies . . . are allowing FLOAT to continue to charge below-market fares." First Am. Compl. ¶ 52 (J.A. 169); *see also id.* ¶¶ 46–47 (J.A. 168) (FLOAT's below-market fares are "[a]ided by Treasury's unlawful disbursements"). Such

"general allegation[s]" are disregarded, *Kareem*, 986 F.3d at 867, and the complaint contains no factual matter regarding the timing of FLOAT's pricing decisions or otherwise suggesting that FLOAT's receipt of PSP disbursements had anything to do with its fare pricing, *see Iqbal*, 556 U.S. at 679 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (quoting FED. R. CIV. P. 8(a)(2)) (second alteration in *Iqbal*)). Indeed, the complaint supplies no factual support for its allegation that FLOAT charges below-market fares in the first place. The complaint alleges only that "FLOAT has been charging below-market fares" ever "[s]ince it began providing service in the Anchorage-Southwest Alaska passenger air transportation market." First Am. Compl. ¶ 47 (J.A. 168). We disregard such "'naked assertion[s]' devoid of 'further factual enhancement'" in evaluating whether the complaint establishes a causal link between the challenged action and the alleged injury. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (alteration in *Iqbal*). Noticeably absent from the complaint is any allegation about the fares FLOAT in fact charges or how those fares compare to prevailing market rates.

In addition, some well-pleaded allegations in the complaint undermine the inference that FLOAT used the disbursements to further its alleged anticompetitive behavior. The complaint asserts that FLOAT's owners used funds from the PSP disbursements to reduce their equity stake in the company, which is inconsistent with an inference that FLOAT used the PSP funds to subsidize its pricing decisions or support its refusal to sublease gate space to Air Excursions. *See Gonzales*, 477 F.3d at 732 ("This Court need not . . . accept inferences that are unsupported by the facts set out in the complaint[.]"). To nudge its theory of causation "across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, Air

Excursions would need to allege more specifically how FLOAT used its PSP disbursements.

In sum, the complaint fails to show that FLOAT charged below-market fares and that FLOAT's receipt of PSP disbursements influenced its pricing decisions or negotiating conduct. *See Kareem*, 986 F.3d at 868. The complaint's "[t]hreadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice." *Arpaio*, 797 F.3d at 19 (quoting *Iqbal*, 556 U.S. at 678) (alterations in *Arpaio*).

**B.**

Remaining are the allegations relating to Air Excursions' role in the Alaskan air transportation market as well as the allegations that the Treasury improperly disbursed $30 million to FLOAT. *See Est. of Boyland v. U.S. Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019) ("[W]hen considering whether a plaintiff has Article III standing, a federal court must assume, *arguendo*, the merits of his or her legal claim."). These allegations are insufficient to sustain a theory of competitor standing.

Competitor standing addresses the injury in fact requirement of Article III standing. Because "increased competition almost surely injures a seller in one form or another," *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010), we have recognized that "parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition," *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998). To invoke competitor standing, a plaintiff must show that the challenged government action results in "an actual or imminent increase in competition, which increase we recognize will almost certainly cause an injury in fact" to any competitor

in the relevant market. *Sherley*, 610 F.3d at 73. The plaintiff must also show that it is in fact "a *direct* and *current* competitor" in that market, in which case the plaintiff's "bottom line may be adversely affected by the challenged government action." *KERM, Inc. v. FCC*, 353 F.3d 57, 60 (D.C. Cir. 2004) (quoting *New World Radio, Inc. v. FCC*, 294 F.3d 164, 170 (D.C. Cir. 2002)); *see also Mendoza v. Perez*, 754 F.3d 1002, 1013 (D.C. Cir. 2014) ("Having concluded individuals competing in the herder labor market have standing to challenge the TEGLs, we need only determine whether any of the plaintiffs in this action is a member of that market."); *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 13–14 (D.C. Cir. 2006) ("the requirement that Nextel be a 'direct' and 'current' competitor of [plaintiffs] is likely met" but plaintiffs "lack competitor standing . . . because they have failed to make a concrete showing that they are likely to suffer financial injury").

The initial inquiry requires that the challenged agency action directly increase competition in the affected market, thereby injuring competitors "as a matter of economic logic." *PSSI Global Servs., LLC v. FCC*, 983 F.3d 1, 12 (D.C. Cir. 2020); *see also New World Radio*, 294 F.3d at 172 ("basic law[s] of economics" hold that increased competition leads to actual injury (quotation omitted)). Agency action may increase competition, for example, if it allows new entrants into a fixed regulated market, *see FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 476–77 (1940); *Mendoza*, 754 F.3d at 1011, if it lifts price controls on a firm's competitor and therefore permits "price competition" that would not otherwise occur, *see La. Energy & Power Auth.*, 141 F.3d at 367, or if it reimburses a firm's competitor for selling its product or service at discounted rates, *see U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002).

Our cases are clear, however, that an agency action does not confer competitor standing if it merely "create[s] a 'skewed playing field,'" *PSSI Global Servs.*, 983 F.3d at 11 (quoting *Mobile Relay*, 457 F.3d at 13), by, for example, providing a "windfall" to a competitor, *see Mobile Relay*, 457 F.3d at 13. For instance, in *PSSI Global Services*, we denied competitor standing to satellite operators that challenged an FCC order making alleged competitors eligible for "relocation payments." 983 F.3d at 5–6. Although the operators complained that the payments were "arbitrarily high" and would "make the already strongest competitors even stronger," they failed to connect their competitors' receipt of payments with a more specific competitive injury. *See id.* at 11–12. Similarly, in *Mobile Relay*, we denied competitor standing to radio licensees that complained the FCC "improperly undervalued" a portion of the electromagnetic spectrum it granted to a competitor because the licensees failed to demonstrate they were "likely to suffer financial injury" as a result of the agency action. 457 F.3d at 12–13; *see also id.* at 13–14 ("bare assertion" that competitor's receipt of a windfall creates a "skewed playing field" "is not enough"). Consequently, a competitor's receipt of a windfall, whether monetary or otherwise, falls short of establishing that "any specific harm" will result "as a matter of economic logic." *PSSI Global Servs.*, 983 F.3d at 11–12; *see also Mobile Relay*, 457 F.3d at 13–14; *Am. Soc'y of Travel Agents, Inc. v. Blumenthal*, 566 F.2d 145, 149 (D.C. Cir. 1977).

Here, the complaint establishes no more than that FLOAT received a windfall of the precise sort *PSSI Global Services* and *Mobile Relay* held was insufficient to support a theory of competitor standing. FLOAT's receipt of a cash "windfall," *see* First Am. Compl. ¶ 50 (J.A. 169), is economically indistinguishable from the cash relocation payments in *PSSI Global Services*, 983 F.3d at 11–12, and the "improperly undervalued" regulatory grant in *Mobile Relay*, 457 F.3d at 12–

13. Although the cash PSP payments may create a "skewed playing field" in the Alaskan air transportation market, a competitor's receipt of a windfall, by itself, "is not enough," *id.* at 13–14, to demonstrate the "actual or imminent increase in competition" required before a plaintiff may invoke competitor standing, *Sherley*, 610 F.3d at 73; *see also PSSI Global Servs.*, 983 F.3d at 11–12; *La. Energy & Power Auth.*, 141 F.3d at 367.

The complaint's deficiencies doom Air Excursion's asserted competitor standing based on FLOAT's alleged below-market fares and therefore make our decision in *U.S. Telecom Association* inapplicable. *See* 295 F.3d at 1331. There, we recognized that price competition is injurious competition; thus, a trade association's members had standing to challenge an FCC order making their competitor "eligible for a subsidy that permits it to offer lower prices for the same . . . services." *Id.* That subsidy reimbursed the competitor for "an amount equal to the aggregate discount" off the standard price of the competitor's services, thereby directly connecting the challenged agency action and the competitor's pricing decisions. *Id.* at 1328; *see also La. Energy & Power Auth.*, 141 F.3d at 366–67 (agency action leading to "increased price competition" causes competitive injury). By contrast, a competitor's receipt of a bare regulatory windfall—like FLOAT's receipt of PSP disbursements—does not necessarily influence the competitor's pricing decisions or otherwise result in increased competition in the industry. *See PSSI Global Servs.*, 983 F.3d at 11–12; *Mobile Relay*, 457 F.3d at 13.

In sum, the competitor standing doctrine supplies the link between increased competition and tangible injury but does not, by itself, supply the link between the challenged conduct and increased competition. The latter must be apparent from the nature of the challenged action itself—as in *U.S. Telecom Association*—or from the well-pleaded allegations of the

plaintiff's complaint—which Air Excursions fails to supply here. To hold otherwise would vitiate Article III's case or controversy requirement and permit a business to superintend its industry's regulatory scheme, even if the agency action at issue threatens the business with only highly attenuated or wholly speculative consequences. *See Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.").

The complaint fails to establish that Air Excursions has suffered a competitive injury satisfying Article III's injury in fact requirement. *See PSSI Global Servs.*, 983 F.3d at 11–12; *Mobile Relay*, 457 F.3d at 13; *cf. U.S. Telecom Ass'n*, 295 F.3d at 1331.[2] We therefore vacate the district court's order granting Treasury's motion to dismiss under Rule 12(b)(6) and remand with instructions to dismiss the complaint because Air Excursions lacks Article III standing.

*So ordered.*

---

[2] Because Air Excursions has not demonstrated that the challenged agency action increases competition in the affected market, we need not determine whether the complaint sufficiently alleges that Air Excursions is in fact FLOAT's "*direct* and *current* competitor." *See KERM, Inc.*, 353 F.3d at 60 (quoting *New World Radio*, 294 F.3d at 170).