# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 20, 2021      Decided December 21, 2021

No. 20-5202

MOHAMMED JIBRIL, INDIVIDUALLY, AND ON BEHALF OF THEIR
MINOR CHILDREN Y.J., AND O.J., ET AL.,
APPELLANTS

v.

ALEJANDRO N. MAYORKAS, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY,
ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-02457)

———

*Christina A. Jump* argued the cause for appellants. With
her on the briefs was *Charles D. Swift*.

*Joshua Waldman*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the brief were
*Brian M. Boynton*, Acting Assistant Attorney General, and
*Sharon Swingle*, Attorney.

Before: HENDERSON and WALKER, *Circuit Judges*, and
EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: In 2018, during extended airline trips, the members of the Jibril family ("Jibrils" or "Appellants"), a family of U.S. citizens, were forced to endure extensive and intrusive security screenings at domestic and international airports. As a result of these encounters with Government agents, the Jibrils believed that they were on a terrorist watchlist maintained by the U.S. Government. They initially invoked an administrative redress process to challenge their alleged inclusion on the watchlist. However, Government officials refused to disclose the family's watchlist status.

Finding the Government's response inadequate to safeguard them from similar treatment in the future, the Jibrils filed suit in the District Court against the Secretary of the Department of Homeland Security and various other federal Government officials (collectively, "Government"). Their complaint alleges violations of the Fourth and Fifth Amendments and the Administrative Procedure Act, and it seeks declaratory and injunctive relief. The Government filed a motion to dismiss, which the District Court granted, with prejudice, on the ground that Appellants lacked Article III standing. *Jibril v. Wolf*, No. 19-cv-2457, slip op. at 6-10 (D.D.C. May 9, 2020), *reprinted in* Joint Appendix ("J.A.") 161-65. The Jibrils now appeal.

Before this court, the Government contends that the judgment of the District Court should be affirmed because the Jibrils' complaint fails to adequately allege any imminent threat of future injury. We disagree. The Jibrils have plausibly alleged that they have future travel plans. We easily infer from the family's travel history that they will soon fly again, particularly if they secure the relief they now seek.

Furthermore, the Jibrils' uncontested factual allegations, combined with the reasonable inferences we draw from them, plausibly indicate that the family likely appeared on a terrorist watchlist in 2018. The Jibrils also plausibly allege that the treatment they endured went well beyond what typical travelers reasonably expect during airport screenings. Finally, the Jibrils' factual allegations lead to the reasonable inference that the family's watchlist status remains the same today. Any information to the contrary is within the Government's exclusive control, and we must draw all reasonable inferences in the Jibrils' favor at this stage of the litigation.

Because the Jibrils plausibly allege that they will travel again soon and that they will again endure the alleged illegalities, they have established an imminent threat of future injury. Therefore, for the reasons that we explain below, we conclude that the Jibrils have standing to pursue most of their claims for prospective relief. However, we hold that the Jibrils lack standing to pursue prospective relief relating to certain actions taken by Government agents who detained them during their travel in 2018. The Jibrils claim that these actions violated established federal policies, but they lack standing because they have not plausibly alleged any impending or substantial risk of future harm. Accordingly, we affirm in part and reverse in part the District Court's judgment and remand the case for further proceedings.

## I. BACKGROUND

### A. Statutory and Regulatory Framework

The Federal Bureau of Investigation ("FBI") administers the multi-agency Terrorist Screening Center, which manages and operates the Terrorist Screening Database ("Database"). *Terrorist Screening Center*, FBI, https://www.fbi.gov/about/

leadership-and-structure/national-security-branch/tsc (last visited Nov. 29, 2021). The Database has at least two subsets intended to identify individuals who may pose a threat to civil aviation: the "No Fly List" and the "Selectee List." *See Matar v. Transp. Sec. Admin.*, 910 F.3d 538, 540 (D.C. Cir. 2018). "Individuals on the No Fly [L]ist are prohibited from boarding airplanes that are traveling to the United States, while individuals on the Selectee List" may fly but "are subject to more rigorous screening" than most passengers. *Id.* People appearing on the Selectee List are not notified about their placement on or removal from the list. Compl. ¶ 76, J.A. 14.

Selectee List travelers almost always receive enhanced screening at border crossings, including airports. *Id.* ¶ 61, J.A. 12. They typically have "SSSS" printed on their boarding passes, which stands for Secondary Screening Security Selection. *Id.* ¶¶ 62-63, J.A. 12; *see also* 49 C.F.R. § 1560.105(b)(2) (2018) (requiring airlines to identify passengers selected by the Transportation Security Administration ("TSA") for enhanced screening). Usually, Selectee List travelers cannot obtain boarding passes at kiosks or on their cell phones and instead must speak with airline staff at ticketing counters, who then must contact government agents before issuing the passes. Compl. ¶¶ 64-65, J.A. 13.

An individual who "believes he or she has been improperly or unfairly delayed or prohibited from boarding an aircraft" because he or she appears on the Selectee List may seek redress through the Traveler Redress Inquiry Program ("TRIP") administered by the Department of Homeland Security ("DHS"). 49 C.F.R. § 1560.205(a), (b) (2018). The individual must submit "personal information and copies of the specified identification documents" to the TRIP office, and TSA may request additional information as needed. *Id.* § 1560.205(c).

"[I]n coordination with the [Terrorist Screening Center] and other appropriate Federal law enforcement or intelligence agencies, if necessary," TSA then "review[s] all the documentation and information requested from the individual, correct[s] any erroneous information, and provide[s] the individual with a timely written response." *Id.* § 1560.205(d). The response neither confirms nor denies the individual's inclusion on the Selectee List. Compl. ¶ 83, J.A. 15. According to the Government, an individual's Selectee List status is covered by the law enforcement privilege and statutorily protected as Sensitive Security Information restricted from public access. Final Br. for Appellees 11 (citing 49 U.S.C. § 114(r) and 49 C.F.R. § 1520.5(a)); *see also Matar*, 910 F.3d at 540 (citing § 1520.5(b)(9)(ii)).

## B. Facts and Procedural History

"Because we review the adequacy of the complaint as a matter of pleading, and not the truth of its allegations, the facts recited here are as [the Jibrils] allege[] them, with reasonable inferences drawn in the [Jibrils'] favor. We take no position on what might ultimately be proved." *VoteVets Action Fund v. U.S. Dep't of Veterans Affs.*, 992 F.3d 1097, 1102 (D.C. Cir. 2021).

Appellants are the married couple Mohammed Jibril ("Mr. Jibril") and Aida Shahin ("Ms. Shahin") and their adult and minor children: Ala'a Jibril, Khalid Jibril, Hamza Jibril, Y.J., and O.J. Compl. ¶¶ 1-7, J.A. 6; Final Br. in Chief for Appellants ii. The Jibrils have sued the following federal officials in their official capacities: Secretary of DHS, Administrator of TSA, Commissioner of Customs and Border Protection ("CBP"), Attorney General, Director of the FBI, and Director of the Terrorist Screening Center. Compl. ¶¶ 8-13, J.A. 6.

Ms. Shahin and Mr. Jibril are U.S. citizens of Jordanian national origin. *Id.* ¶¶ 1-2, J.A. 6. Their children are also U.S. citizens. *Id.* ¶¶ 3-7, J.A. 6. The Jibrils live in California. *Id.* ¶¶ 1-7, J.A. 6. The Jibril family has routinely traveled to Jordan every two to three years, *id.* ¶ 140, J.A. 20, and Mr. Jibril has visited relatives in Jordan between twelve and fifteen times over the past twenty-five years, *id.* ¶ 141, J.A. 20. The Jibrils are Muslims with sincerely held religious beliefs that require traveling to Saudi Arabia to complete Hajj and pilgrimage obligations. *Id.* ¶ 122, J.A. 18. In addition to needing to travel overseas to fulfill these obligations, "the Jibril family wishes to travel to Jordan to see family in the near future, as consistent with their prior travel patterns." *Id.* ¶ 139, J.A. 20.

In 2018, the Jibrils traveled to the Middle East to visit family in Jordan. *Id.* ¶ 94, J.A. 16. After arriving at the airport in Los Angeles for their departing flight, they waited about one hour to receive their boarding passes, all of which had "SSSS" printed on them. *Id.* ¶ 96, J.A. 16. The family members were then searched for about two hours. *Id.* ¶ 97, J.A. 16. During the searches, all members of the family – including the minor children – were subject to pat-down searches. *Id.* Neither Mr. Jibril nor Ms. Shahin was asked for permission prior to the minor children's pat-down searches. *Id.* ¶ 98, J.A. 16. DHS agents then met the Jibrils at the gate for their departing flight. *Id.* ¶ 99, J.A. 16. The agents took the family to a private area and searched their luggage. *Id.* ¶ 100, J.A. 16. Due to this extensive screening, the Jibrils nearly missed their flight. *Id.* ¶ 101, J.A. 16. Once the family arrived in Jordan, they "were interrogated for about two hours," *id.* ¶ 102, J.A. 16, although the complaint does not specify by whom.

The Jibrils remained in Jordan for two months and then began their trip home to California. *Id.* ¶ 103, J.A. 17. "At the Jordanian airport, [Mr.] Jibril was told that American officials

ha[d] an issue with him, and that the family's names would need to be cleared prior to the family boarding the plane." *Id.* ¶ 104, J.A. 17. All family members again had "SSSS" printed on their boarding passes. *Id.* ¶ 105, J.A. 17.

The family's trip home involved a layover in Abu Dhabi, United Arab Emirates. *Id.* ¶ 103, J.A. 17. "After arriving in United Arab Emirates, the family was interrogated for roughly [forty-five] minutes by Abu Dhabi officials." *Id.* ¶ 106, J.A. 17. Customs and Border Protection "agents at the Preclearance location in Abu Dhabi" then detained the Jibrils, separated them from one another, and interrogated them for at least four hours. *Id.* ¶ 107, J.A. 17. Mr. Jibril, Ms. Shahin, and Khalid Jibril were interrogated by themselves. *Id.* ¶¶ 108-10, J.A. 17. Hamza Jibril, who was a minor at the time, was interrogated by himself. *See id.* ¶ 111, J.A. 17. O.J., a minor, remained in the waiting room without his parents at several points. *Id.* ¶ 112, J.A. 17. All electronic devices, including the Jibrils' cell phones, were searched. *Id.* ¶ 113, J.A. 17. The food and spices the Jibrils had packed were searched and thrown out. *Id.* ¶ 116, J.A. 18. The minor children were not offered any food upon their arrival in the CBP holding room. *Id.* ¶ 117, J.A. 18.

Due to their prolonged detention by CBP officials, the Jibrils missed their scheduled flight to Los Angeles and stayed in Abu Dhabi overnight. *Id.* ¶ 118, J.A. 18. No members of the family were asked that night if they had any medical conditions requiring treatment. *Id.* ¶ 119, J.A. 18. After returning to the Abu Dhabi airport the next day, the Jibrils' electronic devices were searched again. *Id.* ¶ 120, J.A. 18. The security measures involved a delay of at least one hour. *Id.* ¶ 121, J.A. 18.

The Jibrils believe the extensive and intrusive security screenings they endured are consistent with the Government's treatment of Selectee List travelers. *See id.* ¶ 123, J.A. 18. In

March 2019, all family members initiated redress inquiries through the Traveler Redress Inquiry Program. *Id.* ¶¶ 126-34, J.A. 18-19. In June 2019, Ala'a Jibril received a response stating, in part:

> DHS has researched and completed our review of your case. DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information. However, we have made any corrections to our records that our inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding incidents of misidentification.

*Id.* ¶ 135, J.A. 19. According to the Jibrils, this is the standard response sent to people who are not on the No Fly List, but who could be on the Selectee List. *Id.* The next month, Mr. Jibril, Ms. Shahin, Khalid Jibril, and Y.J. received similar responses. *See id.* ¶¶ 136-37, J.A. 19-20. O.J. received a slightly different response, which stated, in relevant part, that O.J.'s experience "was most likely caused by a misidentification against a government record or by random selection." *Id.* ¶ 137 n.13, J.A. 20. According to the Jibrils, the response O.J. received "is consistent with persons who are either taken off the No Fly List, or who never were on the No Fly List, but is not standard for persons who believe they are on the Selectee List." *Id.* Hamza Jibril did not receive a responsive determination letter. *Id.* ¶ 138, J.A. 20.

Finding the TRIP responses inadequate to guarantee that they will not face similar treatment during their future travels, the Jibrils filed the instant action. They bring the following claims:

**Count I:** violations of the Jibrils' Fourth Amendment rights due to unreasonable pat-down searches and prolonged detentions;

**Count II:** violations of the Jibrils' Fourth Amendment rights due to warrantless searches of cell phones without probable cause;

**Count III:** violations of the Jibrils' Fifth Amendment procedural rights to due process;

**Count IV:** violations of the Administrative Procedure Act due to detention conditions; and

**Count V:** violations of the Administrative Procedure Act due to lack of adequate procedural due process through policies and available administrative remedy.

*Id.* ¶¶ 146-200, J.A. 21-27. Counts I, II, and IV describe events that occurred during the 2018 trip. The Jibrils allege that, in some instances, Government agents failed to follow their own detention-related policies, which prohibit most pat-down searches of minors and require that family units with juveniles remain together in most instances. *Id.* ¶¶ 151, 184, 190, J.A. 22, 25, 26. Counts III and V allege the Jibrils lack an adequate mechanism to challenge their apparent inclusion on the Selectee List because the TRIP procedures are insufficient. *Id.* ¶¶ 164-79, 194-200, J.A. 23-25, 26-27. The complaint also contains a sixth count, which seeks attorneys' fees. *Id.* ¶¶ 201-03, J.A. 27.

The Jibrils seek declaratory and injunctive relief. *See* Compl. 24-25, J.A. 28-29. First, they ask the court to declare that the Government's actions, policies, practices, and customs violate the Constitution and the Administrative Procedure Act.

Compl. 24, J.A. 28; *see* 5 U.S.C. §§ 701–706. Second, they ask the court to order the Government to revise its TRIP policies and then re-examine the Jibrils' inquiries. Compl. 24, J.A. 28. Third, they seek an injunction barring the Government from conducting warrantless pat-down searches of them or searching their cell phones absent a warrant or probable cause. *Id.* Finally, they seek attorneys' fees and any additional relief the court deems proper. Compl. 25, J.A. 29.

Before the District Court, the Government moved to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim. *See* Fed. R. Civ. P. 12(b)(1), (6). The trial court concluded that the Jibrils lacked Article III standing because they did not plausibly allege a risk of future injury. *Jibril v. Wolf*, No. 19-cv-2457, slip op. at 6-10 (D.D.C. May 9, 2020), *reprinted in* J.A. 161-65. In the District Court's view, the Jibrils failed to establish that they would soon travel again or that they would receive comparable treatment when they did. *Id.* at 6, J.A. 161. The court dismissed the case with prejudice for lack of subject matter jurisdiction and did not reach the Government's argument that the complaint failed to state a claim. *Id.* at 10, J.A. 165; *see id.* at 6-10, J.A. 161-65.

The Jibrils timely challenged the District Court's judgment, and we have jurisdiction over their appeal. 28 U.S.C. § 1291.

## II. ANALYSIS

### A. Standard of Review

We review de novo the District Court's standing determination. *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 110-11 n.3 (D.C. Cir. 2021) (citing *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)).

**B. The Jibrils' Standing**

We begin our analysis by noting that, because the Government neither confirmed nor denied the Jibrils' Selectee List status, the Government's responses to the Jibrils' TRIP inquiries did not moot the family's requests for declaratory and injunctive relief to safeguard them against alleged threats of *future injuries*. *See Cause of Action Inst. v. U.S. Dep't of Just.*, 999 F.3d 696, 703-04 (D.C. Cir. 2021) (holding that even if a party receives relief on a particular claim, this does not moot the party's challenge to the policy or practice that gave rise to the lawsuit) (citing *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988))); *see also Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 121-22 (1974); *Cierco v. Mnuchin*, 857 F.3d 407, 416-17 (D.C. Cir. 2017). The Government maintains, however, that the Jibrils lack standing to pursue prospective relief because they have failed to allege any imminent risk of future injury.

We agree with the Government that, "[f]or claims seeking prospective relief, a plaintiff must show a threatened injury that is certainly impending or a substantial risk that the future harm will occur." Final Br. for Appellees 24; *see also, e.g.*, *Union of Concerned Scientists v. U.S. Dep't of Energy*, 998 F.3d 926, 929 (D.C. Cir. 2021) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). However, contrary to the Government's position, we find that Appellants' complaint adequately alleges facts sufficient to support most of their claims for redress against a substantial risk of future harm. This includes Appellants' claims that their cell phones were searched without probable cause, that they experienced unreasonable treatment and prolonged detention in violation of their constitutional rights, and that the TRIP redress process is inadequate and violates the Administrative Procedure Act and their constitutional rights.

The Jibrils' factual allegations, taken as true, lead to the reasonable inference that the family will again be subjected to many of the alleged illegalities they challenge in this action. The Jibrils' allegations plausibly support their claim that they will soon fly again and that they remain on a terrorist watchlist. This exposes them to an imminent risk of invasive and undue Government actions that they plausibly allege the TRIP process will not prevent. The Jibrils easily satisfy the remaining aspects of our standing analysis. Therefore, for the reasons that we explain below, we conclude that Appellants have standing to pursue most of their claims for prospective relief.

There is one caveat, however. The Jibrils lack standing to pursue certain claims for prospective relief relating to Government agents allegedly violating established federal policies when they detained Appellants during their travel in 2018. In particular, Count I alleges that under CBP policies, "juveniles should not be subject to pat-down searches in almost any circumstance, and not without prior supervisory authorization, unless they are immediate pat-down searches akin to *Terry* frisks," and that "TSA states that it should keep pat-down searches of minors to a minimum." Compl. ¶¶ 151-52, J.A. 22. Count IV alleges that Government policies "require that family units with juveniles remain together unless they must be separated, such as if the family members have different immigration statuses." *Id.* ¶ 184, J.A. 25. The Jibrils claim that these policies were violated by Government agents in 2018. However, because the Jibrils do not plausibly allege that these alleged violations will recur, Appellants fail to establish any imminent injuries with respect to these purported policy violations. *See Cruz v. Am. Airlines Inc.*, 356 F.3d 320, 329 (D.C. Cir. 2004) (relying on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), to conclude that plaintiffs challenging the prospective enforcement of American Airlines' lost-baggage policy lacked standing because it was "not likely" they

"w[ould] again lose their luggage on an international American [Airlines] flight, much less again be denied compensation as a result of the misapplication of [American Airlines' lost-baggage] rule"). Accordingly, the District Court did not err by dismissing these claims.

Nevertheless, as the Government concedes, the District Court's dismissal of these claims should have been without prejudice, as dismissal of the claims for lack of standing is not an adjudication on the merits. *See Havens v. Mabus*, 759 F.3d 91, 98 (D.C. Cir. 2014) ("A jurisdictional dismissal—which is *not* an adjudication on the merits under Rule 41(b)—is, then, a dismissal without prejudice.").

Finally, it should be noted that, although the Jibrils may have had standing to seek damages – including nominal damages – to redress the alleged harms they suffered during their travels in 2018, they have not sought such relief. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801-02 (2021) (discussing the possibility of an award of nominal damages to redress a *past* injury). Accordingly, in our analysis below, we focus only on the Jibrils' standing to seek declaratory and injunctive relief to safeguard against cognizable alleged future harms.

### 1. *Legal Framework*

Article III of the United States Constitution "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.' For there to be a case or controversy under Article III, the plaintiff must have a 'personal stake' in the case—in other words, standing." *TransUnion*, 141 S. Ct. at 2203 (quotation marks omitted) (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)).

14

The party invoking federal jurisdiction bears the burden of demonstrating Article III standing. *Id.* at 2207-08 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). The plaintiff must demonstrate standing for each claim that is being pressed and for each form of relief that is being sought. *Id.* at 2208 (citations omitted). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* at 2203 (citing *Lujan*, 504 U.S. at 560-61).

As discussed above, an alleged future injury may suffice to establish standing if the threatened injury is "certainly impending" or there is a "substantial risk" it will occur. *New Jersey v. EPA*, 989 F.3d 1038, 1047 (D.C. Cir. 2021) (quoting *Attias v. Carefirst, Inc.*, 865 F.3d 620, 626-27 (D.C. Cir. 2017)) (citing *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019)); *see also TransUnion*, 141 S. Ct. at 2210 ("[A] person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013) and *Lyons*, 461 U.S. at 102)). Although a plaintiff seeking prospective declaratory and injunctive relief "may not rest on past injury" alone, *Arpaio*, 797 F.3d at 19, "'[p]ast wrongs' may serve as 'evidence bearing on whether there is a real and immediate threat of repeated injury,'" *N.B. ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 84 (D.C. Cir. 2012) (alteration in original) (quoting *Lyons*, 461 U.S. at 102).

Each element of the standing analysis "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of

evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561 (collecting cases). At the pleading stage, "plaintiffs are required only to 'state a *plausible* claim' that each of the standing elements is present." *Attias*, 865 F.3d at 625-26 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)) (citing *Lujan*, 504 U.S. at 561). "Accordingly, '[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim [of standing] that is plausible on its face." *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021) (alterations in original) (quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), *cert. denied*, --- S. Ct. ---, 2021 WL 5284636 (Nov. 15, 2021). And the court "assume[s], for purposes of the standing analysis, that plaintiffs will prevail on the merits of their claim[s]." *Attias*, 865 F.3d at 629.

### 2. The Jibrils Have Standing to Pursue Their Claims for Relief to Safeguard Them from Substantial Risks of Future Harm

#### a. Future Travel Plans

The Jibrils' history of traveling to Jordan every two years to visit family, combined with their professed desire to continue that pattern, strongly suggests that they will travel internationally within the next year or two. *See In re Navy Chaplaincy*, 697 F.3d 1171, 1176 (D.C. Cir. 2012) (concluding that plaintiffs who "w[ould] probably appear" "in the near future" "before selection boards" employing challenged policies and procedures sufficiently alleged they would "engage in the conduct they claim will cause them injury"). Mr. Jibril's history of visiting relatives in Jordan between twelve and fifteen times over the past twenty-five years provides support for this inference. It is also noteworthy that the family's sincerely held religious beliefs require them to travel to Saudi

Arabia to fulfill religious obligations. These allegations lead to the reasonable inference that the Jibrils will soon travel again, particularly if their names are removed from the Selectee List and they can secure protection from the court against undue searches and interrogations.

In opposing Appellants' position, the Government points out that, in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992), the Supreme Court stated that plaintiffs' "'some day' intentions" to travel are insufficient to support standing. Final Br. for Appellees 29-30 (quoting *Lujan*, 504 U.S. at 564). However, the facts in *Lujan* are quite different from the facts in this case. The plaintiffs in *Lujan* – "organizations dedicated to wildlife conservation and other environmental causes" – sought to prove future travel plans by pointing to affidavits from two members. *Lujan*, 504 U.S. at 559, 563. The first stated she had once visited Egypt and "intend[ed] to do so again." *Id.* at 563. The second averred she had once travelled to Sri Lanka and "intend[ed] to go back" but "had no current plans" to do so. *Id.* at 563-64. The instant case is easily distinguishable, as the Jibrils allege an extensive travel history supporting their future plans, which evince an imminence the *Lujan* plaintiffs' "'some day' intentions" lacked. *See Ghedi v. Mayorkas*, 16 F.4th 456, 465 (5th Cir. 2021) (concluding that a plaintiff who purportedly appeared on the Selectee List and "allege[d] both a professional need for habitual travel and that his injuries [we]re tied to the *act of flying*, not his destination" plausibly alleged "that his next flight, and thus, injury, [wa]s both real and immediate").

    b.   2018 Selectee List Status

The Jibrils also plausibly allege that they appeared on a terrorist watchlist in 2018. We infer from the inclusion of "SSSS" on the Jibrils' boarding passes and the extensive

searches and interrogation the Jibrils endured during their international travels in 2018 that the family members appeared on a terrorist watchlist during that trip.

The Government does not dispute that the Jibrils' 2018 experience is consistent with its treatment of Selectee List passengers. It maintains, however, that the Jibrils' allegations are merely "compatible with," but not "more likely explained by," the family's Selectee List inclusion. Final Br. for Appellees 37 (quoting *Kareem*, 986 F.3d at 869). In support of this argument, the Government relies on: (1) declarations from Government officials purporting to establish that the majority of passengers designated for enhanced screening are so designated for reasons other than inclusion in the Database and (2) a Government report stating that 98% of TRIP inquires have no connection to any Database identity. *See, e.g.*, Final Br. for Appellees 4 n.1; J.A. 94-104. This material falls far short of justifying a rejection of Appellants' complaint at the pleading stage of this litigation on a motion to dismiss.

First, the declarations, which were filed in an unrelated out-of-circuit action, were not before the District Court, and we decline to take judicial notice of them. *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017) ("[A] court cannot take judicial notice of the truth of a document simply because someone put it in the court's files." (alteration in original) (quoting 21B Fed. Prac. & Proc. Evid. § 5106.4 (2d ed.))).

Second, the government report containing the 98% statistic is devoid of any meaningful context. *See Overview of the U.S.*

*Government's Watchlisting Process and Procedures as of January 2018*, *reprinted in* J.A. 94-104. Although the report states that approximately 98% of TRIP inquiries have no connection to any watchlist identity, it does not indicate what proportion of the redress inquiries the Government receives are from travelers who experienced treatment as severe and time-delaying as what the Jibrils encountered. *See id.* at 8, J.A. 102.

The Government also argues that the Jibrils' extensive travel history undermines their purported inclusion on the Selectee List, as the family apparently traveled without incident before 2018. Final Br. for Appellees 35. This is a specious argument. The Jibrils' factual allegations lead to the reasonable inference that the Government placed the Jibrils on the watchlist after their pre-2018 travels but before their 2018 trip.

c.  Current Selectee List Status

Finally, the Jibrils' factual allegations lead us to the reasonable inference that the family members remain on the Selectee List today. The Jibrils allege that although they have completed the only redress process available to them, they cannot determine their watchlist status because this information is in the Government's exclusive control, and the Government refuses to disclose it. Drawing all reasonable inferences in favor of the Jibrils, we presume that the family members' watchlist status "remains the same" "[u]nless the [G]overnment provides documentation" to the contrary. *See Shearson v. Holder*, 725 F.3d 588, 593 (6th Cir. 2013). Because the Government has provided no information to the contrary, we infer from the Jibrils' factual allegations that the family members remain on the watchlist.

The Government argues that even assuming the Jibrils appeared on a watchlist in 2018, there is no indication they remain on such a list today, as the family has completed the TRIP redress process and Government agents consistently audit and update the Selectee List. Final Br. for Appellees 41-43. The Government maintains that presuming the Jibrils remain on such a list today is tantamount to finding standing based solely on the fact that necessary information is within a defendant's exclusive control. *Id.* at 47 n.11. We disagree.

In support of their argument, the Government points to our decision in *Kareem v. Haspel*, 986 F.3d at 861, in which a U.S. citizen journalist working in Syria claimed that he was mistakenly placed on a list of individuals the United States had determined were terrorists it could target and kill. The journalist, who sought prospective relief, claimed he had narrowly missed being hit by military strikes five times, and he believed he was the target of those strikes. *Id.* at 862. The court in *Kareem* noted that, although "[w]e have recognized that 'pleadings on information and belief are permitted when the necessary information lies within defendants' control,'" "we also require that the allegations based on information and belief 'be accompanied by a statement of the facts upon which the allegations are based.'" *Id.* at 866 (quotation marks omitted) (quoting *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 n.3 (D.C. Cir. 1994)) (citing *Tooley v. Napolitano*, 586 F.3d 1006, 1007-08, 1010 (D.C. Cir. 2009)). We concluded that the journalist's factual allegations were insufficient to establish standing, as they did not "create a plausible inference that the described missile attacks were attributable to the United States and specifically targeted" him. *Id.* at 865.

The situation in this case is quite different. As explained above, the Jibrils allege facts supporting the conclusion that they appeared on the Selectee List during their 2018 travels.

We simply draw the reasonable inference from those facts that this remains the case today, particularly since the Government has provided no evidence to the contrary.

At oral argument, Government counsel suggested that if the Jibrils would like to determine whether they remain on a terrorist watchlist, some or all members of the family can book another trip to see whether they endure the same problems that they faced in 2018. Whether this suggestion was meant to be a tongue-in-cheek quip or simply a heartless argument, it makes no sense. As explained above, the Supreme Court has made it clear that "a person exposed to a risk of future harm may pursue forward-looking, injunctive relief *to prevent the harm from occurring*, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion*, 141 S. Ct. at 2210 (emphasis added) (citations omitted). A plaintiff is not required to wait for an injury to occur in order to satisfy Article III standing requirements. On the record before us, we find that the Jibrils' complaint plausibly alleges a risk of harm that is sufficiently imminent and substantial. Therefore, they have standing to pursue a number of their claims for prospective relief.

***

In sum, the Jibrils' future travel plans, combined with the reasonable inference that they remain on the Selectee List, indicate they will soon be subjected to the challenged Government actions again. Accordingly, the Jibrils adequately allege an imminent threat of future injury for those claims challenging the Government's policies and the alleged lack of adequate redress process. *See In re Navy Chaplaincy*, 697 F.3d at 1178 (holding that plaintiffs plausibly alleged a future injury where the defendant "neither dispute[d] plaintiffs' claims that

they w[ould] expose themselves to potential injury . . . nor argue[d] that it ha[d] any plans to change the procedures alleged to injure plaintiffs"). This feared injury is concrete and particularized, as the harm is real, rather than abstract, and it affects the Jibrils "in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (collecting cases).

The Jibrils also satisfy the remaining aspects of our standing inquiry. The imminent injury is plainly traceable to the Government's actions, and the prospective relief the Jibrils seek, including revisions to the TRIP policies, would ameliorate the alleged future harms with respect to which they complain. We note, however, that because Selectee List status constitutes Sensitive Security Information, *see* 49 U.S.C. § 114(r); 49 C.F.R. § 1520.5(a), and the Government maintains that watchlist-status disclosure raises weighty national security concerns, Final Br. for Appellees 11, revisions to the TRIP policies may not exist that would allow the Jibrils to discover whether they are – or ever were – on the Selectee List.

Accordingly, the Jibrils have standing to pursue their claims for prospective relief discussed above.

## III. CONCLUSION

For the foregoing reasons, we affirm in part and reverse in part the District Court's judgment and remand the case for further proceedings consistent with this opinion.